## GERALD F. ADLER *v.* AMERICAN STANDARD CORPORATION

[Misc. No. 12, September Term, 1980.]

*Decided July 16, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*J. Owen Zurhellen, III,* with whom were *Schonwald, Haber, Zurhellen & Mullman* and *Stephen D. Langhoff* and *Smith & Langhoff* on the brief, for appellant.

*H. Thomas Howell* and *Sidney G. Leech,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

The United States District Court for the District of Maryland, pursuant to Maryland Code (1974, 1980 Repl. Vol.), § 12-601 of the Courts and Judicial Proceedings Article, has certified for our determination the following questions of state law:

> (1) Is a cause of action for "abusive discharge" recognized under the substantive law of the State of Maryland?
>
> (2) Do the allegations of the Amended Complaint, if taken as true, state a cause of action for "abusive discharge" under the substantive law of the State of Maryland?

The amended complaint was filed by Gerald Adler against American Standard Corporation (the Corporation) to recover general, special and punitive damages for Adler's claimed "abusive discharge" from his employment with the Corporation. Adler alleged in his complaint that he was employed in March of 1975 as an Assistant General Manager of the Corporation's Commercial Printing Division at a salary of $37,000 per year; that James Kinealy was Vice

President and General Manager of the Division and James Sinclair was Vice President in charge of the Corporation's Graphic Arts Group, which encompassed the Commercial Printing Division; and that it was Adler's responsibility to conduct a thorough analysis of the management and operational structure of the Commercial Printing Division and to propose changes which would promote efficiency in management and operations and enhance the accuracy of intracorporate transmittal of information. The complaint alleged that Adler was "complimented for his efforts by his superiors" and by August 1, 1978 his annual salary had been increased to $60,000. According to further averments of the amended complaint, Adler "discovered numerous inadequacies in the management and operation of the Commercial Printing Division and, also, numerous improper and possibly illegal practices, including:

> a. Attempts to treat capital expenditures as expenses.
> b. Payment of commercial bribes.
> c. Falsification of sales and income information, and alteration of commercial documents to support the falsified information.
> d. Misuse of corporate funds by officers for their personal benefit.
> e. Manipulation of work-in-process inventory information.
> f. Alteration of forecasts in connection with intra-corporate financial reporting."

The amended complaint alleged that on repeated occasions Adler reported his "discoveries" to Kinealy and Sinclair and made recommendations respecting their correction but that Kinealy and Sinclair "consistently failed and refused to give consideration to plaintiff's discoveries and recommendations and, indeed, discouraged further efforts on his part." The complaint alleged that Adler communicated his findings to the Corporation's headquarters personnel on several occasions and "was praised for his candor, was urged to continue his efforts and was assured that his position

would not be jeopardized by so doing"; that as a result of Adler's activities Kinealy and Sinclair "became increasingly insecure and suspicious that ... [Adler's] adherence to his stipulated responsibilities compromised their own positions"; that a high-level managerial meeting was scheduled for October 13, 1978, at which headquarters personnel were to be present; that Adler intended at that meeting "to discuss frankly the improprieties which troubled him"; that Kinealy and Sinclair insisted at that time that Adler resign; and that after Adler refused to resign, he received a letter signed by Kinealy and Sinclair on behalf of the Corporation informing him that his employment was terminated "for unsatisfactory performance." The amended complaint alleged that Adler's discharge by the Corporation "was motivated solely by its desire, and the desire of its superior management personnel, to conceal improprieties and illegal activities which plaintiff might have disclosed at the meeting scheduled for October 13, 1978 and on other occasions should he have remained in defendant's employ ... including the payment of commercial bribes and the falsification of corporate records and financial statistics, ... [which were] contrary to the public policy of the State of New York, the State of Maryland and of the United States, and thus constituted an abusive discharge."

The Corporation filed a motion to dismiss Adler's complaint on the ground that it failed to state a cause of action under Maryland law. In its Order of Certification, the District Court noted that a hearing was conducted on the motion to dismiss, at which Adler contended "that although he was an employee at will with no fixed term of employment and no written employment contract, he can maintain a cause of action against the defendant for 'abusive discharge' because the motives that prompted the defendant corporation to fire [him], namely the concealment of various activities (commercial bribery, falsification of corporate records, falsification of corporate financial data), were contrary to the public policy of the State of Maryland, especially in view of his satisfactory performance as evidenced by the regular salary increases and excellent performance appraisals." The Certification Order also noted that it was the Corporation's

position that Maryland law does not recognize a cause of action for "abusive discharge," and that, in any event, Adler's discharge was prompted by a genuine dissatisfaction with his performance as an employee.

## (A)

The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time. *St. Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 360 A.2d 1 (1976); *Vincent v. Palmer,* 179 Md. 365, 19 A.2d 183 (1941); *W., B. & A.R.R. Co. v. Moss,* 127 Md. 12, 96 A. 273 (1915). Statutes enacted by many states have, however, engrafted exceptions upon the terminable at will doctrine that abrogate an employer's absolute right to discharge an at will employee for any or no reason. In Maryland, for example, under Maryland Code (1957, 1979 Repl. Vol.) Art. 49B, § 16 (a) (1), it is unlawful for an employer to discharge any employee "because of . . . race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment . . . ."[1]

Adler concedes that his discharge was not specifically prohibited by any Maryland statute. However, he urges that a judicial exception to the terminable at will doctrine be recognized in Maryland to permit an at will employee, discharged in a manner that contravenes public policy, to

---

1. The absolute right of the employer to discharge an employee is inhibited by other Maryland statutes. *See, e.g.,* Code (1957, 1979 Repl. Vol.) Art. 89, § 43 (employee may not be discharged for involvement in the enforcement of Maryland's Occupational Safety and Health Act); Art. 101, § 39A (unlawful to discharge an employee for filing a workmen's compensation claim); § 15-606, Commercial Law Article (1975, 1980 Cum. Supp.) (unlawful to discharge employee whose wages are subjected to attachment under certain circumstances); §§ 8-105, 8-401, Courts & Judicial Proceedings Article (1974, 1980 Repl. Vol.) (unlawful to discharge employee for time lost because of jury service).

maintain a cause of action for abusive or wrongful discharge against his former employer.[2]

Jurisdictions that have considered wrongful discharge actions as an exception to the common law terminable at will doctrine have followed essentially three courses of action. Some courts have flatly refused to recognize a cause of action for wrongful discharge, rigidly adhering to the rule that an employer's motivation for discharging an at will employee is irrelevant. *See Bender Ship Repair, Inc. v. Stevens,* 379 So. 2d 594 (Ala. 1980); *Segal v. Arrow Industries Corp.,* 364 So. 2d 89 (Fla. Ct. App. 1978); *Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978); *Kelly v. Mississippi Valley Gas Co.,* 397 So. 2d 874 (Miss. 1981); *Christy v. Petrus,* 365 Mo. 1187, 295 S.W.2d 122 (1956); *Dockery v. Lampart Table Co.,* 36 N.C. App. 293, 244 S.E.2d 272 (1978). Other courts, while declining to recognize a cause of action for wrongful discharge on the facts of the cases before them, have indicated a willingness to adopt a judicial exception to the terminable at will doctrine in a proper case. *See, e.g., Lampe v. Presbyterian Med. Center,* 41 Colo. App. 465, 590 P.2d 513 (1978); *Jackson v. Minidoka Irrigation Dist.,* 98 Idaho 330, 563 P.2d 54 (1977); *Scroghan v. Kraftco Corp.,* 551 S.W.2d 811 (Ky. 1977); *Keneally v. Orgain,* 606 P.2d 127 (Mont. 1980); *Jones v. Keogh,* 137 Vt. 562, 409 A.2d 581 (1979); *Ward v. Frito-Lay, Inc.,* 95 Wis. 2d 372, 290 N.W.2d 536 (Wis. App. 1980). Still other courts have recognized a cause of action for wrongful discharge, either in tort or in contract, and in doing so have primarily focused upon the employer's motivation for discharging the employee.

*Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974), held that an action for wrongful discharge of an at will employee would lie in contract. In that case, an at will employee had been fired as a result of her foreman's hostility towards her, which developed when she refused to socialize

---

2. Courts have characterized this cause of action as one for "wrongful," "abusive," or "retaliatory" discharge. Our use of the phrase "wrongful discharge" encompasses all three appellations.

with him. The court, indicating that it sought to balance the interests of the employer and employee, affirmed the jury's award of damages and held that:

> "[T]ermination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation . . . constitutes a breach of the employment contract."[3] *Id.* at 133, 316 A.2d at 551.

In *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), a salesman employed at will had been discharged because the employer sought to avoid payment of bonuses that the salesman would have earned upon delivery of certain goods. The court permitted the salesman to recover in an action in contract. Although refusing to extend its ruling to all employment at will contracts, the court held that the contract before it contained "an implied covenant of good faith and fair dealing . . . ." *Id.* at 101, 364 N.E.2d at 1256. Because the salesman's termination had not been in good faith, the court concluded that the employer had breached the employment contract. *See Petermann v. International Brotherhood of Teamsters,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959).

A majority of the courts expressly recognizing a cause of action for wrongful discharge have treated the employees' claims as tort actions. Several of these cases involve at will employees fired in retaliation for filing workmen's compensation claims. In *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973), the court held that a worker fired for exercising his statutorily conferred right to file a workmen's compensation claim was entitled to damages. In *Kelsay v. Motorola, Inc.,* 74 Ill. 2d 172, 384 N.E.2d 353 (1978), the court stressed that the public policy of the State, as expressed in the workmen's compensation statute,

---

**3.** In Howard v. Dorr Woolen Co., 120 N.H. 295, 414 A.2d 1273, 1274 (1980), the Supreme Court of New Hampshire interpreted its *Monge* decision in the following manner: "We construe *Monge* to apply only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn."

could be effectively enforced only by allowing wrongfully discharged employees to maintain a personal action for damages. Other at will employees discharged for filing workmen's compensation claims have been given a right to recover damages because the discharge was for a socially undesirable motive, *Brown v. Transcon Lines,* 284 Or. 597, 588 P.2d 1087 (1978), or because it was intended to contravene the State's public policy. *Sventko v. Kroger Co.,* 69 Mich. App. 644, 245 N.W.2d 151 (1976). These cases, to some extent, relied on workmen's compensation statutes as a basis for recognition of the employees' causes of action.

An at will employee who had been discharged for refusing to participate in an illegal price fixing scheme was the subject of the court's inquiry in *Tameny v. Atlantic Richfield Co.,* 27 Cal. 3d 167, 610 P.2d 1330, 164 Cal. Rptr. 839 (1980). The court held that the discharge was actionable:

> "[A]n employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." *Id.* at 178, 610 P.2d at 1336-37.

In *Harless v. First National Bank,* 246 S.E.2d 270, 275 (W. Va. 1978), discharge of an at will bank employee in retaliation for the employee's efforts to force the bank to comply with state and federal consumer credit laws was held to be actionable because the discharge contravened a "substantial public policy principle" — the protection of consumers covered by the state and federal legislation. In *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975), the court affirmed a jury award of compensatory damages made to an at will employee fired for serving on a jury. The court found

the employee had been discharged "for such a socially undesirable motive that the employer must respond in damages for any injury done." *Id.* at 218, 536 P.2d at 515. In *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), an at will employee with responsibility for exercising control over the quality of the employer's food products was allegedly dismissed in retaliation for his insistence that the employer comply with a state law governing the labeling and licensing of the employer's products. The court, in recognizing a tort action for wrongful discharge, said that it had to decide "where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not." 427 A.2d at 387. Observing that the state law contained criminal penalties for its violation, the court concluded:

> "We need not decide whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy. Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents. For today, it is enough to decide that an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." *Id.* at 389.

Finally, in *Palmateer v. International Harvester Co.,* 85 Ill. 2d 124, 424 N.E.2d 876, (Ill. Sup. Ct. 1981), an at will employee was fired for reporting the suspected criminal activity of a fellow employee to local law enforcement officials and agreeing to cooperate in the investigation and possible prosecution of the alleged crime. The court, in a 4-3 decision, held that the employee had stated a cause of action because: "The foundation of the tort of retaliatory discharge lies in the protection of public policy, and there is a clear public policy favoring investigation and prosecution of criminal offenses." 85 Ill. 2d at 133. The dissent criticized the majority's decision on the ground that: "Here the public policy supporting the cause of action cannot be found in any

expression of the legislature, but only in the vague belief that public policy requires that we all become 'citizen crime-fighters.' " *Id.* at 136 (quoting from majority opinion at 133).

With few exceptions, courts recognizing a cause of action for wrongful discharge have to some extent relied on statutory expressions of public policy as a basis for the employee's claim. Courts holding that at will employees failed to state a cause of action, but recognizing implicitly or expressly that a cause of action would be recognized under proper circumstances, generally do so on the grounds that no clear mandate of public policy was contravened by the discharge. In *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), an employee at will had been discharged because of continual charges, made to company officials, that one of the company's products was unsafe. The employee, a salesman, had bypassed his immediate supervisors in making the charges and therefore failed to follow established procedures. The employee did not identify any specific statutory source of public policy as a basis for his action, but relied instead on the general notion that it was the public policy of the State to encourage production of safe products. Concluding that this was insufficient, the court observed that although the employee's motivation in making the charges may have been praiseworthy, that alone could not override "the company's legitimate interest in preserving its normal operational procedures from disruption." *Id.* at 183, 319 A.2d at 180 (footnote omitted). The court recognized that economic conditions had changed since 1891, when its predecessors had adopted the rule that an employer's motive for discharging an at will employee was irrelevant. Nevertheless, the court, in denying recovery, held that:

> "[W]here the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge." *Id.* at 184-85, 319 A.2d at 180.

*But see Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir. 1979) (at will employee fired for refusing to take a polygraph test stated cause of action for wrongful discharge under Pennsylvania law); *Reuther v. Fowler & Williams, Inc.,* 255 Pa. Super. 28, 386 A.2d 119 (1978) (at will employee fired because of taking time off from work for jury duty stated cause of action for wrongful discharge under Pennsylvania law).

In *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980), a medical doctor employed at will by a drug manufacturing company was discharged for refusing to continue work on development of a product that contained saccharine. Although the product could not be tested on human beings until the company had received the approval of the Federal Food and Drug Administration, the employee nevertheless felt that continued work on the product would violate her Hippocratic Oath. The court held that:

> "[A]n employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. . . . An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause." *Id.* at 72, 417 A.2d at 512.

The court held that the employee had failed to state a cause of action because she had not demonstrated that her refusal to continue working on the project was based on a clear mandate of public policy. The court said that her interpretation of the Hippocratic Oath did not amount to a clear mandate, and her discharge did not violate public policy.

### (B)

We recognize that modern economic conditions differ significantly from those that existed when the at will rule was

first advanced in the latter part of the nineteenth century. *See* Blades, *Employment At Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404 (1967). According to 1980 census statistics, a majority of American workers do not have the job security provided by collective bargaining agreements or civil service regulations. *See* Comment, *Protecting At Will Employees Against Wrongful Discharge: The Duty To Terminate Only In Good Faith,* 93 Harv. L. Rev. 1816, 1816 n. 2 (1980). When terminated without notice, an employee is suddenly faced with an uncertain job future and the difficult prospect of meeting continuing economic obligations. But this circumstance, of itself, hardly warrants adoption of a rule that would forbid termination of at will employees whenever the termination appeared "wrongful" to a court or a jury. On the other hand, an at will employee's interest in job security, particularly when continued employment is threatened not by genuine dissatisfaction with job performance but because the employee has refused to act in an unlawful manner or attempted to perform a statutorily prescribed duty, is deserving of recognition. Equally to be considered is that the employer has an important interest in being able to discharge an at will employee whenever it would be beneficial to his business. Finally, society as a whole has an interest in ensuring that its laws and important public policies are not contravened. Any modification of the at will rule must take into account all of these interests.

As we have indicated, few courts have flatly rejected the notion that the wrongful discharge of an at will employee may give rise to a cause of action for damages. Where courts differ is in determining where the line is to be drawn that separates a wrongful from a legally permissible discharge. This determination depends in large part on whether the public policy allegedly violated is sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.

The common law terminable at will doctrine in Maryland is, of course, subject to modification by judicial decision

where this Court finds that it is no longer suitable to the circumstances of our people. *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981); *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980). Nor have we hesitated to adopt a new cause of action by judicial decision where that course was compelled by changing circumstances. *See, e.g., Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977); *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1967). The reasoning of the growing number of jurisdictions that have recognized wrongful discharge as a new cause of action persuades us that, in a proper case, such an action should be adopted in this State. The fundamental issue then is whether Adler's amended complaint, on its face, contains allegations sufficient to state a cause of action for wrongful discharge. To answer this certified question, we must determine from the averments of the complaint whether Adler's discharge contravened some clear mandate of public policy.

Adler points to two sources of public policy. First, he contends that the misconduct of the Corporation's employees involving the payment of commercial bribes and the falsification of corporate records — the disclosure of which prompted his discharge — was in violation of the criminal law of the State, Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 174. Second, he urges that practices such as commercial bribery and the falsification of corporate records are so clearly against public policy that he need not identify any statute or rule of law specifically prohibiting such improper and possibly illegal practices. Adler defines "public policy" as that which is "commonly accepted as necessary to the public good" — a definition which encompasses more than violations of the criminal laws of the State. Adler maintains that because the allegations of the complaint demonstrate that his discharge by the Corporation was motivated by the latter's desire to prevent his further disclosure of the improper conduct, and to permit its continuation, his discharge was itself a violation of a clear mandate of public policy, giving rise to a cause of action for wrongful discharge.

Adler's reliance upon § 174 is misplaced. The section

declares it a misdemeanor for any officer or agent of any corporation

> "fraudulently [to] sign, or in any other manner assent to any statement or publication, either for the public or the shareholders thereof, containing untruthful representations of its affairs, assets or liabilities with a view either to enhance or depress the market value of the shares therein, or the value of its corporate obligations, or in any other manner to accomplish any fraud thereby . . . ."

Accepting the averments of Adler's complaint as true, we think they are too general, too conclusory, too vague and lacking in specifics to mount up to a prima facie showing that the claimed misconduct contravened § 174 and hence violated the public policy of this State. Adler's complaint does not assert that the falsification of corporate records was done with an intent to defraud either stockholders or the public at large by enhancing or depressing the market value of the Corporation's shares or other obligations. As a result, the allegations of the complaint do not set forth a violation of the conduct proscribed by § 174. Indeed, during oral argument of the case before us, Adler's counsel was asked whether his complaint was intended to allege the commission of a crime. In response, he stated that he could not say one way or the other whether the claimed misconduct constituted a crime.

Nor do we think that the averments of Adler's complaint otherwise demonstrate a violation of a clear mandate of the public policy of this State. Judge Levine, writing for the Court, in *Md.-Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 386 A.2d 1216 (1978), discussed the concept of public policy at length:

> "Nearly 150 years ago Lord Truro set forth what has become the classical formulation of the public policy doctrine — that to which we adhere in Maryland:

'Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law.' *Egerton v. Earl Brownlow,* 4 H. L. Cas. 1, 196 (1853).

... But beyond this relatively indeterminate description of the doctrine, jurists to this day have been unable to fashion a truly workable definition of public policy. Not being restricted to the conventional sources of positive law (constitutions, statutes and judicial decisions), judges are frequently called upon to discern the dictates of sound social policy and human welfare based on nothing more than their own personal experience and intellectual capacity.... Inevitably, conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty." *Id.* at 605-606, 386 A.2d at 1228 (citations omitted).

As indicated, the Court has not confined itself to legislative enactments, prior judicial decisions or administrative regulations when determining the public policy of this State. We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch. *See First Nat'l Bank v. Fid. & Dep. Co.,* 283 Md. 228, 389 A.2d 359 (1978). We have been consistently reluctant, for example, to strike down voluntary contractual arrangements on public policy grounds. *See, e.g., Food Fair Stores v. Joy,* 283 Md. 205, 389 A.2d 874 (1978); *Md.-Nat'l Cap. P. & P., supra.* As Mr. Justice Sutherland stated for the Supreme Court in *Patton v. United States,* 281 U.S. 276, 306, 50 S. Ct. 253, 261, 74 L. Ed. 854 (1930):

"The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another." (Emphasis added.)

To recapitulate, Adler's amended complaint alleged that he observed and disclosed the following "improper and possibly illegal practices" while employed by the Corporation: attempts to treat capital expenditures as expenses; payment of commercial bribes; falsification of corporate sales and income data and alteration of commercial documents to support the falsified information; misuse of corporate funds by officers for their personal benefit; manipulation of work-in-process inventory information; and alteration of forecasts in connection with intra-corporate financial reporting. The allegations suggest serious misconduct, yet Adler fails to provide any factual details to support the general and conclusory averments of the complaint. Nor does he point to any specific statutory provision, other than Art. 27, § 174, or other existing rule of law that particularly prohibits the claimed misconduct. While Adler suggested before us that the commercial bribery and falsification of corporate records violated the Sherman Act, 15 U.S.C. §§ 1-7 (1973), and the Maryland Antitrust Act, Md. Code (1975, 1980 Cum. Supp.) Commercial Law, §§ 11-201 to -213, his complaint does not recite, with the requisite degree of specificity, the manner in which these statutory enactments were offended so as to constitute a violation of the public policy of this State. The bald allegations of Adler's complaint do not provide a sufficient factual predicate for determining whether any declared mandate of public policy was violated. Adler's undisclosed perception of what constitutes "commercial bribery" or "falsification of corporate documents" is hardly an adequate ground upon which to

base a decision that such activities violate the declared or undeclared public policy of this State. The allegations are therefore legally insufficient to state a cause of action for wrongful discharge.

Accordingly, in answer to the first certified question, Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy; and in answer to the second certified question, the allegations of the amended complaint, taken as true, together with all reasonable inferences to be drawn therefrom, do not state a cause of action for abusive discharge.

> *Questions of law answered as herein set forth; costs to be divided equally between the parties in accordance with the Order of Certification.*