935 F.2d 1286
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Michael A. DeGIROLAMO, Plaintiff-Appellant,
v.
SANUS CORPORATION HEALTH SYSTEMS, Howard Waltman, Joseph
Lynaugh, Defendants-Appellees.
 No. 90-2146.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 6, 1991.
Decided June 17, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. William M. Nickerson, District Judge. (CA-88-26-WN)
 Raymond Donald Battocchi, McLean, Va., for appellant.
 Timothy Edward Howie, O'Malley, Miles & Harrell, Upper Marlboro, Md. (Argued), for Appellees; Thomas L. Doran, O'Malley, Miles & Harrell, Upper Marlboro, Md., on brief.
 D.Md.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before DONALD RUSSELL and NIEMEYER, Circuit Judges, and JAMES B. McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Michael A. DeGirolamo, having been discharged from his employment with Sanus Corp. Health Systems, sued Sanus and two of its officers, Howard L. Waltman and Joseph T. Lynaugh. His complaint alleges state common law counts for abusive discharge, breach of employment contract, and fraud. The district court granted the defendants' motion for summary judgment and this appeal followed. Because there is a genuine issue of material fact about whether DeGirolamo was terminated because he refused to engage in illegal conduct, we reverse the judgment on the abusive discharge count. We affirm the judgment of the district court on the remaining counts.
 
 
 2
 * DeGirolamo was hired by Lynaugh and Waltman on April 1, 1986, to be the executive director of HealthPlus, a health maintenance organization (HMO) and a subsidiary of Sanus. Waltman served as the chairman of the board of directors of both HealthPlus and Sanus, and Lynaugh as the president. DeGirolamo contends that prior to accepting the position as executive director Waltman promised him that the job would be his as long as his performance was good and that he could expect his relationship with Sanus to be a long one. After DeGirolamo accepted the job, he received a letter from Waltman dated March 18, 1986, which summarized their discussions and reflected their "basic agreement." The letter stated his salary, explained how he might earn a performance bonus, and stated that Waltman would recommend to the board that DeGirolamo be awarded stock options. The letter concluded, "We are looking forward to a long and rewarding relationship."
 
 
 3
 Several months after taking over as executive director, DeGirolamo learned that the federal Office of Personnel Management (OPM) intended to conduct an audit of HealthPlus and its pricing policies to investigate the possibility that HealthPlus, in violation of government regulations concerning HMOs, had been offering health insurance to certain nongovernment customers at a rate lower than that offered to the federal government. DeGirolamo contends that he learned that HealthPlus had in fact sold health insurance to commercial customers at discounted rates not offered to the government and that Waltman and Lynaugh intended to camouflage this fact. DeGirolamo asserts, "I made clear to HealthPlus officials that I would not participate in such illegal activities, and urged them to refrain from doing so. I specifically stated that I would not lie to the auditors, and told them not to do so." After stating his intention not to participate in illegal activity, DeGirolamo was told by Waltman not to talk to the federal auditors.
 
 
 4
 The audit occurred in September and October of 1986, and the OPM concluded that HealthPlus had engaged in the improper practice of "discounting." As a result the OPM directed that HealthPlus pay the federal government over $800,000. On January 23, 1987, DeGirolamo was terminated without warning or explanation. Later, defendants advanced the reason that DeGirolamo was not performing adequately.
 
 
 5
 During DeGirolamo's tenure as executive director, HealthPlus' enrollment increased, and its administrative and medical costs, as a percentage of revenues, decreased. As a result, he turned the organization's financial status around by earning a profit of $393,668 in 1986. In 1985, the year before DeGirolamo was hired, HealthPlus lost $136,474.
 
 
 6
 In his complaint, DeGirolamo contends 1) that the defendants wrongfully discharged him by firing him for refusing to participate in illegal activity, i.e., concealing the discount pricing of health insurance; 2) that the defendants breached an employment contract by firing him and by not paying him a bonus; and 3) that the defendants committed fraud by making promises regarding his employment on which he relied and which they had no intention of keeping.
 
 II
 
 7
 The tort of abusive or wrongful discharge is recognized in Maryland as a judicially-created exception to the employment at will doctrine. This tort creates "a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." Adler v. American Standard Corp., 291 Md. 31, 47 (1981). In subsequent litigation in the Adler case, we noted that the Maryland Court of Appeals intended for the abusive discharge tort to be limited in scope, and we therefore concluded that it applied only "to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty." Adler v. American Standard Corp., 830 F.2d 1303, 1307 (4th Cir.1987).
 
 
 8
 Without conceding that he was an employee at will, DeGirolamo argues that the defendants abusively discharged him in violation of public policy because he refused to engage in illegal activity.[1] The defendants contend that he was never asked to violate any statute or to participate in any illegal activity. They do not dispute, however, that a request was made to DeGirolamo not to engage in the audit process involving the OPM.
 
 
 9
 Upon reviewing the record, we believe that DeGirolamo has produced sufficient evidence, albeit thin, to create a genuine issue of material fact on the question of whether he was fired because of his refusal. DeGirolamo's affidavit[2] explains that he learned that Lynaugh and Waltman intended "to fabricate a false explanation" for HealthPlus's pricing practices, that he told them that he would not participate in the deception, that he urged Waltman and Lynaugh not to engage in illegal activity, that he would not lie to the auditors, and that he was told by Waltman to stay away from the OPM auditors. He contends that, notwithstanding his urging, Waltman and Lynaugh gave the auditors a false explanation for the price discounting.
 
 
 10
 After the audit, which was completed in October 1986, OPM determined that HealthPlus had engaged in "discounting" and that as a result HealthPlus owed the federal government over $800,000. Nevertheless, Lynaugh indicated to DeGirolamo that HealthPlus would not meekly " 'roll over' and pay any penalty" as a result of the OPM audit; rather, the company would "develop logic as to why HealthPlus had discounted rates to commercial clients." A few months later, DeGirolamo was fired without warning, and no reason was given. He presented evidence that his performance was acceptable and that he had improved the financial performance of HealthPlus. He urges that the only reasonable explanation which may be inferred from all the circumstances is that he was terminated because he refused to go along with the management position to lie to the OPM and thereafter cover up.
 
 
 11
 At this stage of the proceeding, of course, DeGirolamo's evidence must be believed, and all reasonable inferences are to be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Although the question is a close one, the totality of the evidence he submitted, combined with the absence of an explanation for his termination at the time when the performance of his unit was arguably good, leaves open a reasonable inference that 1) he was prohibited by management from dealing with the OPM personnel because he refused to lie to them about the discounting, and 2) he was subsequently terminated for the same reason. Although no direct evidence was presented that DeGirolamo was expressly requested to lie, the inference may be drawn that that was management's position on the issue, particularly when, in the ordinary course of affairs, DeGirolamo as the senior officer of his unit would ordinarily deal with the OPM. We observe that the facts are somewhat complex and the inferences to be drawn from them are conflicting. Resolving the inferences in favor of DeGirolamo leads to the conclusion that it is improper to resolve this issue on motion for summary judgment.
 
 III
 
 12
 DeGirolamo's breach of contract claim is based on statements to the effect that DeGirolamo could expect to work as the executive director of HealthPlus as long as his performance was good. He argues that these statements are enforceable promises that limited the defendants' discretion to terminate his otherwise indefinite employment status.
 
 
 13
 Under Maryland law, an employment contract may be either for a stated term or at will. Chae Management, Inc. v. Leibowitz, 50 Md.App. 504, 513 (1982). Maryland follows the common law rule "that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." Adler, 291 Md. at 35.
 
 
 14
 In support of his claim for breach of contract, DeGirolamo relies on the promise that the job would be his as long as his performance was good and on the statements in a letter dated March 18, 1986, that the chairman of the board was "looking forward to a long and rewarding relationship" with DeGirolamo. In deposition testimony, DeGirolamo agreed that the letter does not specify a definite period of time for employment and that he never demanded a contract for a specific number of years. Indeed, he admitted that he was hired for "an indefinite period of time." J.A. 68-69.
 
 
 15
 A claim that an employee was not permitted to work until retirement or some other long term does not state a cause of action for breach of contract when the term of contract is indefinite. Under well settled principles of Maryland law, when an employment contract provides for an employment for an indefinite period of time, the employee is an "at will" employee whose employment may be terminated at any time. Adler, 291 Md. at 35.
 
 
 16
 DeGirolamo also argues that these promises infer that he could be terminated only for cause. Cf. Staggs v. Blue Cross of Maryland, Inc., 61 Md.App. 381, 392 (personnel policy statements which limit an employer's discretion to terminate an indefinite employment may, if properly communicated to an employee, become enforceable by the employee), cert. denied, 303 Md. 295 (1985). The vague statements that DeGirolamo would have the job as long as he performed well do not, however, rise to the level of a contractual agreement that good cause be given for termination. See MacGill v. Blue Cross of Maryland, Inc., 77 Md.App. 613, 620 (general policy statements do not meet the contractual requirements for an offer), cert. denied, 315 Md. 692 (1989).
 
 
 17
 DeGirolamo finally argues that defendants breached their agreement to pay a bonus in accordance with the terms explained in the letter from Waltman dated March 18, 1986. The letter provided in pertinent part:
 
 
 18
 As the Executive Director of HealthPlus, you ... will have the opportunity to earn a $25,000 bonus for the year, based upon performance. The criteria for the bonus will be set when you are sufficiently comfortable with the nature of the business, and will include enrollment, administrative costs and medical costs. It will be payable, if earned, twice yearly; at the 6-month mark and then at the end of the year.
 
 
 19
 Any agreement stated in this letter gives the defendants discretion in setting the criteria for the bonus. They never did so, but DeGirolamo never requested that they establish bonus criteria. Thus, there is no way of determining if DeGirolamo would have met any standard which should have been established. As the district court noted, the bonus was merely "an opportunity ... if earned," and not a guarantee. The district court did not err in granting summary judgment on this issue.
 
 IV
 
 20
 In his final cause of action, DeGirolamo asserts that the defendants defrauded him when they promised him a bonus and a long employment which could be terminated for cause only, because they never intended to keep those promises when they made them. Even at the summary judgment stage fraud must be proven by clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. at 254-55; Everett v. Baltimore Gas & Elec. Co., 307 Md. 286, 300 (1986).
 
 
 21
 DeGirolamo's evidence in this case relates to his discharge, his performance, and the failure by the defendants to establish bonus criteria. No evidence was presented to show that defendants made any promise with fraudulent intent, and summary judgment on that count is therefore appropriate.
 
 
 22
 For the foregoing reasons, the summary judgment entered with respect to DeGirolamo's abusive discharge claim is reversed, and with respect to his claims of breach of contract and fraud is affirmed. The case is remanded for further proceedings consistent with this opinion.
 
 
 23
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 24
 JAMES B. McMILLAN, Senior District Judge, concurs with separate concurring opinion.
 
 
 25
 JAMES B. McMILLAN, Senior District Judge, concurring:
 
 
 26
 I readily concur in sections I, II, and III of the court's per curiam opinion.
 
 
 27
 I have reluctantly concluded that I must also concur in section IV of that opinion, which affirms the district court's dismissal of DeGirolamo's fraud claim.
 
 
 28
 Defendant Howard Waltman's March 18, 1986 letter to DeGirolamo reads, in relevant part:
 
 
 29
 "In addition, you will have the opportunity to earn a $25,000 bonus for the year, based upon performance. The criteria for the bonus will be set when you are sufficiently comfortable with the nature of the business, and will include enrollment, administrative costs and medical costs. It will be payable, if earned, twice yearly; at the 6-month mark and then at the end of the year."
 
 
 30
 Joint Appendix ("J.A.") at 34.
 
 
 31
 Defendants had apparently made similar "promises" to other employees, who, like DeGirolamo, were never given bonuses nor provided with criteria for earning bonuses. See J.A. at 58-66.
 
 
 32
 Defendants' "promise" was obviously made as an inducement to prospective employees. It was drafted with great intelligence but low purpose, and is couched in the weasel-word language of fraud. Defendants' "promise" is so vague that it does not constitute an enforceable promise to do anything. There is no way for a court, nor anyone else, to determine what the "opportunity" would be; what "performance" would be required; what the "criteria for the bonus" would be; when, if ever, DeGirolamo would become "sufficiently comfortable [whatever that means] with the nature of the business" and how his level of comfort would be determined; nor "if [the bonus was] earned."
 
 
 33
 Although I believe that defendants have violated the spirit of the laws against fraud, they do not appear to have violated the letter of those laws. Vagueness remains a stock weapon in the arsenal of fraud.
 
 
 34
 I therefore (with a reluctance as to section IV that I hope is shared by all members of the panel) concur in the court's per curiam opinion.
 
 
 
 [1]
 The specific laws or regulations which DeGirolamo allegedly refused to violate are: 18 U.S.C. Sec. 1001 (prohibiting false or fictitious statements to the government); 18 U.S.C. Sec. 286 (conspiring to defraud the government with respect to claims); 18 U.S.C. Sec. 287 (presenting false or fraudulent claims to federal agencies); 18 U.S.C. Sec. 641 (embezzling or converting federal money or property); 5 U.S.C. Sec. 8910(b) (carriers must permit federal agencies to examine necessary records); and 5 C.F.R. Sec. 890.202(c)(d) (carrier must keep and permit examination of all relevant records)
 
 
 [2]
 The defendants argue that the affidavit should not be considered because it does not comply with Fed.R.Civ.P. 56(e). It is apparent, however, that DeGirolamo has stated facts based on his personal knowledge, thus rendering him competent to testify regarding the OPM audit and his termination. Cf. Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc., 831 F.2d 77, 80 (5th Cir.1987) (failure to meet technical requirements of Rule 56(e) is not fatal if record as a whole demonstrates affiant's competency to testify); Spannaus v. U.S. Dep't of Justice, 813 F.2d 1285, 1289 (4th Cir.1987) (affiant's demonstration of ample personal knowledge rendered him competent to testify)