Virginia Elaine **SUMMERVILLE**, Successor Personal Representative for the Estate of Robert R. Driscoll, Plaintiff-Appellant,

v.

**MICROCOM CORPORATION,**
Defendant–Appellee,

and

**G. William Barsby, Defendant.**

No. 93–1815.

United States Court of Appeals,
Fourth Circuit.

Argued April 15, 1994.

Decided Dec. 29, 1994.

**ARGUED:** J. Michael Conroy, Jr., Conroy, Ballman & Dameron, Chartered, Gaithersburg, MD, for appellant. Michael M. Mustokoff, Duane, Morris & Heckscher, Philadelphia, PA, for appellee. **ON BRIEF:** Teresa N. Cavenagh, Duane, Morris & Heckscher, Philadelphia, PA, for appellee.

Before MURNAGHAN, Circuit Judge, SPROUSE, Senior Circuit Judge, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

Reversed and remanded by published opinion. Senior Judge SPROUSE wrote the opinion, in which Judge MURNAGHAN and Judge RESTANI joined.

## OPINION

SPROUSE, Senior Circuit Judge:

The administratrix of the estate of Robert R. Driscoll appeals from a summary judgment granted to Microcom Corporation in the estate's action to recover commissions which it contends Microcom should have paid Driscoll on sales of DKTs[1] to the U.S. Navy.

Microcom is a Pennsylvania corporation that manufactures airborne telemetry components and systems. Its major customers include Boeing, Lockheed, and various defense agencies. The sale of DKTs to the Navy comprises a significant portion of Microcom's business.

Driscoll began his employment with Microcom in 1967 as a manufacturer's representative. In 1972, he was promoted to a position as Microcom's Navy Business Representative and its Washington Representative. The terms of his employment were defined in a letter agreement dated September 14, 1972. According to this agreement, Driscoll was to be responsible for "sales and contract and technical liaison with all U.S. Navy Commands, Laboratories, Test Centers, and other Navy facilities." His duties included "customer contacts, proposal preparation and presentation, contract discussions and engineering, production and management co-ordination [sic]." The letter agreement, forming the contract between Microcom and Driscoll, provided him with an annual salary of $20,000 plus "commissions of one percent for products and services sold by Microcom to the Navy Department" and reimbursement of his business expenses up to $1,300 per month. The agreement provided that it could be terminated by either party upon thirty days' written notice.

Driscoll negotiated contracts with the Navy on Microcom's behalf for some fifteen years. By 1987, however, the government had begun to change the way it awarded certain types of contracts, including those dealing with its purchases of DKTs. Instead of procuring by negotiated contracts, the Navy began advertising its DKT procurements for public bidding and awarding contracts to the lowest bidder. Initially, Microcom was not successful under the public bidding scheme. In response to this situation, the company contemplated changing Driscoll's employment contract. Microcom's actions in this regard gave rise to the dispute which we review on this appeal.

According to the version of facts offered by Driscoll's estate, Microcom executives began discussing with Driscoll in 1985 the possibility of changing the terms of his contract. Although these discussions were prompted largely by Microcom's reluctance to pay a commission to a salesman who had contributed minimally, if at all, to the contract's procurement, Driscoll's own dissatisfaction with his role also motivated the talks. In November 1987, William Barsby, Driscoll's supervisor, presented him with a document outlining the proposed new compensation terms: Driscoll's salary would increase from $40,000 to $50,000 per year, he would receive two percent commissions on a limited number of contracts, and he would no longer be entitled to commissions on DKT contracts entered into with the Navy. The document also provided: "Previous Agreements are cancelled as of 11/4/87." It was signed by Microcom's president, Marvin Steinberg, and by Barsby. A line was included for Driscoll's signature, but he never signed the document.

Despite Driscoll's failure to sign or orally assent to the proposed modified contract, Microcom contends that it instituted the changes outlined in the November 1987 agreement within a month[2] after the Dris-

1. DKTs are remote sensing devices that replace missile warheads during training missions and are used to gather and transmit information about the missile's performance to a ground station.

2. According to a status/payroll change report dated November 11, 1987, effective November 4,

1987, Robert Driscoll's base salary was increased to $50,000 and his commission draw was reduced to $300 per week. Taking into account both the increase in his base salary and the reduction in his commission draw, the net increase in Driscoll's annual pay was $872.98. During the previous twelve-year period, 1975–

coll/Barsby meeting. The estate, on the other hand, contends that Driscoll was not aware that these changes had been effected. It asserts that Driscoll's pay stubs show his pay was reduced after November 1987 and adds that his wage statements reveal he earned less in 1988 than he did in 1986. Nor did the elimination of the DKT commissions immediately become obvious. In deposition testimony, one of Driscoll's former co-workers, Michael J. Doherty ("Doherty"), and Driscoll's ex-wife, Sally Driscoll, both said Driscoll had previously experienced delays and other difficulties in obtaining his commission payments from Microcom. Furthermore, Doherty testified that, after receiving the proposed 1987 contract from Microcom, Driscoll participated in a series of meetings with Microcom concerning his contract. Asked whether Driscoll told him the company had held to the position it had set forth in the 1987 contract, Doherty responded that he thought the company had changed its position and that the discussions were still continuing, although nothing had been resolved.

In July 1988, Microcom received an $18.6 million DKT contract award from the Navy ("the NAVSEA contract"). Driscoll anticipated he would receive a $400,000 commission from this contract. However, Microcom credited the award to its house account, a fact which Driscoll only discovered in early August when he received his monthly "booking report" for July.[3] The deposition testimony of another of Driscoll's former co-workers, Betty Jonston ("Jonston"), indicates that Driscoll and Microcom engaged in a dispute regarding his contract and a discrepancy between what he was being paid and what he thought he was entitled to. Jonston also testified about Driscoll's unhappiness over the status of his contract. Driscoll continued working for Microcom until illness forced him to stop in June 1990. He died a few months later.

On April 3, 1991, the administratrix of Driscoll's estate filed suit against Microcom in Maryland state court, seeking to enforce the 1972 letter agreement and to obtain a commission on the 1988 NAVSEA contract and other Navy contracts. The defendant, relying on diversity, removed the case to federal district court. The parties subsequently consented to the court's referral of the action to a magistrate. After briefing and a hearing, the magistrate, applying Maryland law, found that Microcom had unilaterally modified an "at will" employment contract, that Driscoll had accepted the modification, and that Maryland courts would likely recognize such a modification. The magistrate granted Microcom's motion for summary judgment.

In granting summary judgment to Microcom, the magistrate recognized that, although Maryland courts have ruled that "at will" contracts can be unilaterally terminated, the state's courts have not yet addressed the question of whether such contracts can be unilaterally modified. The magistrate decided, however, that Maryland courts would allow unilateral modification if faced with that issue. She concluded that the circumstances underlying the parties' dispute demonstrated that Microcom intended to, and in fact did, modify the 1972 letter agreement, terminating Driscoll's previous entitlement to a 1% commission on DKT sales to the Navy. The magistrate further found that, even if Microcom had not unilaterally modified the "at will" contract, the written proposal that Barsby gave Driscoll in November 1987 was at least an offer, which Driscoll accepted by receiving, without objection, the benefits set forth in the proposed agreement. We disagree with the magistrate's assessment and are persuaded that genuine issues of material fact bear on the resolution of these questions. We, therefore, reverse.

■ We review the magistrate court's grant of summary judgment *de novo*, employing the same standards applied by that court. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1172,

1986 (inclusive), Driscoll's pay increases averaged $1,465.83 per year.

**3.** A handwritten note appearing on Driscoll's July 1988 booking report and dated 8/8/88 reads: "Lori Z said she & Mal credited 18.6 M Nav Sea contr to my acct but B. Barsby said to take it off. B. Barsby says he knows nothing about it. BShit".

117 L.Ed.2d 417 (1992). A grant of summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Inferences drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■■■ There is no question that, under Maryland law, "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). As the district court recognized, however, whether the terms of an "at will" employment contract can be modified unilaterally is a question the Maryland courts have not yet addressed. In any event, we are not persuaded that the answer to this question resolves the parties' dispute. Even if Microcom had the right to unilaterally modify the terms of its contract with Driscoll, in our view, there remains the significant question of whether Microcom actually intended to modify the existing contract or whether it was attempting to create a new contract by making a traditional offer for a contemplated acceptance.

Under the facts as we must view them, discussions of the prospective modified employment terms went on for nearly two years before Barsby tendered the proposed written contract to Driscoll in November 1987. The proposal was signed by Barsby and Steinberg and included a signature line designated for Driscoll. Although it contained language indicating that all previous agreements were cancelled as of November 4, 1987, the proposed agreement was only given to Driscoll on or after November 9, 1987.[4] Thus, on its face, the proposal failed to honor the 1972 agreement's requirement that Driscoll be given thirty days' notice before that contract could be terminated.

Driscoll placed the proposed agreement in his briefcase, saying he would study it. However, he never signed the document. Assuming, as it appears, that Microcom never gave Driscoll any other written notice of its intention to modify his employment contract, its failure to include the required thirty-day notice in its November 1987 proposal would vitiate that proposal, leaving the 1972 employment contract intact.

Nonetheless, Microcom contends, and the magistrate found, that even if Driscoll did not formally accept Microcom's offer modifying the 1972 contract, his course of conduct sufficed to constitute an acceptance. Microcom argues that Driscoll's acceptance was evidenced by his actions in some instances and his silence in others. Primarily, it contends that Driscoll's acceptance of its offer was manifested by his continuing to work under the new employment terms.

The estate contends contrarily that a proper interpretation of the facts shows that Driscoll was unaware that Microcom had instituted the changes because the company did not notify him. Even Driscoll's pay stubs, the estate argues, did not reveal any significant change in his base salary after November 1987. Nor, in light of Driscoll's previous difficulties in obtaining commission payments owed him, did Microcom's failure to credit the NAVSEA contract to his account necessarily constitute notice that the company had unilaterally implemented the terms of the 1987 proposed contract. Given this lack of notice, the estate argues that the change in increments of pay was not evidence that Driscoll accepted Microcom's 1987 offer. The estate further contends that Driscoll did not acquiesce in Microcom's failure to pay him a 1% commission on the NAVSEA contract. Its support for this contention includes deposition testimony regarding Driscoll's participation in on-going negotiations with Microcom, through which he hoped to obtain the commission payments that he believed Microcom owed him under the 1972 contract. The estate also claims that, shortly before he became ill, Driscoll realized he would have to sue the company in order to obtain his commission on the NAVSEA con-

---

**4.** Barsby's signature is dated "11/4/87" and Steinberg's is dated "9 Nov 87 [sic]."

tract and he took initial steps in that direction before his illness precluded further action.

We, of course, are not fact finders, and, in our view, the parties' factual contentions concerning the issues of offer and acceptance must be resolved by the fact finder. The grant of summary judgment is, therefore, reversed and the case remanded for trial in accordance with the views expressed in this opinion.

*REVERSED AND REMANDED.*