DAUGHERTY *v.* KESSLER ET UX.

\* \* \*

KESSLER ET UX. *v.* MERCHANT ET AL.

[No. 147, September Term, 1971.]

*Decided January 19, 1972.*

282

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Charles E. Hogg* for John T. Daugherty, appellant and Lewis C. Merchant, one of cross-appellees.

*David M. Williams* for Elwood W. Kessler et ux., appellees and cross-appellants.

*Ernest N. Cory, Jr.,* for Citizens National Bank of Southern Maryland, other cross-appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The essential question posed to the jury in this case was whether the successful effort of an owner of a store building in economically burgeoning St. Mary's County to bring the tenants in another store building to his building was an exercise of fair or unfair competition. Unfair was the answer of the jury.

To be precise, the jury found on issues that the plaintiffs-appellees and cross-appellants, Elwood Kessler and his wife (Kessler), had orally leased a store building to Steven Pratt and Paul Griffith, defendants (but not appellants), for ten years at a rental of $350 a month; that John T. Daugherty, another defendant and the appellant, had wrongfully induced Pratt and Griffith to break this lease; that Daugherty owed Kessler $9,500 in actual damages and $7,000 in punitive damages; that Pratt, Griffith and Daugherty had wrongfully conspired to bring about the breaking of the lease and owed Kessler actual damages of $28,350 and punitive damages of $15,000. Judge Mayfield entered judgment against Daugherty for one cent actual damages and $7,000 punitive damages on the theory that malicious interference with property rights and conspiracy to so interfere overlap, and the award of $9,500 against Daugherty for actual damages was approximately one-third of the $28,-350 for actual damages against the three defendants for

conspiring to interfere. He entered judgment against the three for $28,350 actual and $15,000 punitive damages.

At the conclusion of the plaintiffs' testimony, Judge Mayfield directed verdicts for the cross-appellees, The Citizens National Bank of Southern Maryland (of which Daugherty was president and a director) and Lewis Cato Merchant, chairman of the board of the bank and a friend and business associate of Daugherty, who had also been sued by Kessler for compensatory and punitive damages for interfering with the business relations between Kessler and Pratt and Griffith. We think Judge Mayfield was accurate in concluding that the evidence was insufficient to permit the jury to find the bank and Merchant guilty of the torts charged to them, and will affirm the judgments in their favor. We find further that the evidence against Daugherty, Pratt and Griffith was insufficient to support a finding of actual malice, the prerequisite to liability for punitive damages in cases of this nature. *Damazo v. Wahby*, 259 Md. 627; *St. Paul at Chase Corp. v. The Manufacturers L. I. Co.*, 262 Md. 192, which are indistinguishable on the point, require this holding. The judgments for actual damages against Daugherty for one cent and against Daugherty, Pratt and Griffith for $28,350 will be affirmed.

Appellant's substantial arguments are that (1) the oral lease or agreement to lease for ten years was "void" under the strictures of Code (1957), Art. 21, § 1 ("No Estate [in land] above seven years shall pass or take effect unless the deed conveying the same shall be executed, acknowledged and recorded * * *") and therefore is not susceptible of interference by a third party; (2) there was no evidence that Kessler on the one hand and Pratt and Griffith on the other had made an agreement to lease or to make a lease; (3) there was not sufficient evidence to show a conspiracy to interfere with any lease or agreement to lease; (4) if Kessler was entitled to any recovery the correct measure of damages

would be one year's rent. In our view none of the arguments will hold water.

The argument that the oral agreement of lease or to lease was void and therefore there was nothing with which to interfere was rejected on demurrer, correctly we think, by Judge Macgill. It is true that it has been held that a contract to create a leasehold interest that does not comply with § 1 of Art. 21 of the Code will pass no estate and that an oral agreement to transfer a leasehold interest is not only within the statute of frauds—in the instant case the allegations indicate that actually the fourth section of the statute rather than the registry laws was relied on—but is ineffectual under the registry laws. This, however, does not make the oral agreement "void" in the sense the appellant contends. Courts have used the words "void," "voidable," "invalid" and "unenforceable" imprecisely, and when they say an oral contract is void, usually do not mean it except to a limited extent. An oral contract, like that before us, may be unenforceable as between the parties but between them and as to third parties may in various aspects have life, force and effect. 2 *Corbin on Contracts,* § 279, The Legal Operation of the Statute of Frauds, pp. 20-21, says: "A contract where the parties have not complied with the requirements of the statute is neither void nor voidable; it has much effect upon the legal relations of the contracting parties with each other and with third persons." There are set out in the succeeding pages nine explicit ways in which an oral agreement that violates the statute may be valid and operative. See also Corbin *op. cit.* § 284, in which his analysis of the law and the cases shows that usually the word void means no more than unenforceable between the parties.

In Prosser, *Law of Torts,* Ch. 26, Economic Relations, § 123, Interference with Contractual Relations, pp. 955-956, it is said:

> "Virtually any type of contract is sufficient as the foundation of an action for procuring

its breach. It must of course be in force and effect, and not illegal as in restraint of trade, or otherwise opposed to public policy, so that the law will not aid in upholding it. * * *

"The agreement need not, however, be enforceable by the plaintiff as a contract. * * * Accordingly, it usually is held that contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, or harsh and unconscionable provisions, or conditions precedent to the existence of the obligation, can still afford a basis for a tort action when the defendant interferes with their performance."

This Court has several times indicated that it agrees with Professor Prosser's views. See *Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 388, a suit for wrongful interference with a contract, where it was held that:

"The cause of action is the tortious act of the defendant in procuring or causing the breach of the plaintiff's contracts with the Mallard Company * * *. Nor does the fact that one of these contracts was oral affect the sufficiency of the *narr.* The contract is not void, although it might not have been enforceable against the Mallard Company. But this circumstance cannot avail the defendant. This was decided in *Knickerbocker Ice Company v. Gardiner Co.,* 107 Md. 556."

In *Horn v. Seth,* 201 Md. 589, 593, Judge Henderson (later Chief Judge) for the Court said:

"It is perfectly clear under the Maryland authorities that intentional and unlawful interference with obligations created by a contract to purchase real estate, if known to the interferer, may give rise to a cause of action in tort

* * *. In the language of the *Restatement, Torts,* § 768(i) : 'When B is legally free to deal either with C or with A, the privilege of competition implies a privilege on the part of A to induce B to deal with him rather than with C. But when B is legally obligated to deal with C, A is not privileged, by the mere fact of competition, to induce B to commit a breach of his legal duty.' § 766(c) makes it clear that interference with a contract may be beyond the scope of the privilege of lawful competition even though the contract may be unenforceable because of noncompliance with the Statute of Frauds. This principle appears to have been recognized in *Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 388 * * *."

See, too, *Chapman v. Ford,* 246 Md. 42, 52, and for authority out of State, *Kamm v. Flink* (N.J. Law), 175 A. 62 and *Ringler v. Ruby* (Ore.), 244 P. 509.

The declaration alleged and the proof showed that Daugherty knew that Pratt and Griffith were tenants of Kessler—although there was testimony that he thought there was no written binding lease as well as testimony to the contrary—and his knowledge of the fact of their occupancy as tenants brings him within the requirement that an interferer, to be liable, must know of the contract which is interfered with. In *Stannard v. McCool,* 198 Md. 609, 617-618, § 766, of *Restatement, Torts,* is quoted with approval to this extent:

" 'To be subject to liability * * * the actor must have knowledge of the business expectancy with which he is interfering * * * But it is not necessary that the actor appreciate the legal significance of the facts which give rise to the contractual duty. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that there is no contract or that the contract means

something other than what it is judicially held to mean.' "

There was testimony that Kessler as a property owner and Pratt and Griffith as prospective tenants had a meeting of the minds and agreed to a lease on explicit terms. There was also evidence (a) that Pratt, Griffith and Daugherty conspired to bring about a breaking of the lease, and (b) that Pratt and Griffith bought a building in which Daugherty had a fifty per cent beneficial interest from which to conduct a Penn-Jersey store. Kessler offered testimony as to the following facts:

He owned two and a half acres on Great Mills Road near Lexington Park in St. Mary's County. Griffith and one Jerry Lowe sought to buy the land. He did not wish to sell but said he would build a store on the land and rent it to them. Lowe and Griffith decided to conduct a Penn-Jersey store in the building to be built. Kessler procured plans for such a store from the Penn-Jersey Company. Construction was begun in August 1967. Griffith and Lowe were to pay $350 a month for ten years.

By October the building had reached the stage where Griffith and Lowe, assisted by Kelly, a Penn-Jersey man, set up the store and stocked it. It opened on November 9, although some work still had to be completed and did about a thousand dollars worth of business that day. Kessler had been told in July by the Patuxent Water Company (which was owned in part and run by a wartime buddy, a close personal friend and fellow bank director of Daugherty) that water and sewerage would be available. It was when they were stocking the store that it became evident that the water company would not provide sewerage for six or eight months. It was at this time, too, that Daugherty made a visit to the store and talked to Griffith.

Lowe found he could not finance the store as he had planned, and Kelly told Kessler Penn-Jersey would operate it until Griffith could arrange financing for the franchise. This suited Kessler and he continued to work

towards completion of the building. On December 4, 1967 Pratt and Griffith told Kessler in the store that they would be operating the store jointly from then on. The three decided to put the agreement for a $350 a month rental for ten years in writing and mutually agreed on a lawyer to prepare the lease. In December Kessler got a form of lease from the lawyer's secretary, considered it with his wife and told the lawyer he approved the form, and the lawyer arranged a meeting for the next day. Kessler, Pratt and Griffith met in the lawyer's office and in Kessler's words "[the lawyer] had that lease and read over everything * * * and everything was agreed on * * * agreed on the leasing of the building * * * and when the rent was to be in, and the amounts they were to pay and the ten year lease—$350—ten years—[to commence] the first of January 1968." A few days later, Kessler signed the lease and left it in the office for Pratt and Griffith to sign.

On December 30 Griffith handed Kessler an envelope containing the January rent for $350 and Kessler asked him if he had signed the lease. He said no "it's not ready yet." Kessler said it is ready and I signed it yesterday. "And, then he gave me such a surprised look and run up the steps."

In early January the sewerage problem was discussed. Kessler offered to procure an outside toilet. Pratt told Kessler not to worry because he, Pratt, had one that could be moved to the store. Up to this point there had been no complaints by the tenants about the building. Towards the end of January, Kessler began to smell a rat about Pratt and Griffith's intentions. His son Leonard learned that Pratt had approached one Cullison about installing a heating system in the Daugherty building and Cullison gave him a bid and Pratt and Cullison went to see Daugherty who, according to Cullison, told Pratt: "make sure it's what you want." William M. Loker, Jr., a lawyer, testified he was instructed in late January to prepare an Agreement of Sale from Merchant and

Daugherty to Pratt and Griffith of the Daugherty building. On February 2, 1968 the agreement was executed. On February 4, two days later, Leonard Kessler went to see Griffith, a former schoolmate for years, and asked him why he was moving from his father's store when his father had mortgaged his home and everything else he owned to build the store for him. Leonard was allowed to testify over the objection that the testimony was not admissible against anybody but Griffith:

> "And his reply was that, he was not trying to do anything to my father, that he's always liked and respected my father, but that he had to follow the monies; that he did not intend to have anybody believe that he had any money to invest in this. So at this point, I [Leonard] said to him, 'It's not hard to see what's happened' that 'I would like for you to correct me if I'm wrong,' "

and Leonard continued:

> "I told Paul to correct me, that if I'm wrong. And I said, 'It looks to me, you people went to the Citizens National Bank for your financing. I've seen you working on this building out here; that somewhere along the lines you have been promised these finances to operate your building and to remodel and move into another building, if you would sign a lease on this new building.' And Paul's reply was, 'That is exactly right.' "

\* \* \*

> "During the course of this conversation Paul told me that Jack Daugherty had negotiated the whole deal."

\* \* \*

> "Well, I had asked Paul whether Jack Daugherty had realized that there was a lease to this building and his reply was, 'Yes.' "

The Daugherty building had been vacant for most of the last several years and Daugherty was paying the taxes and insurance. He had permitted Anchor Van Lines, of which he was president and part owner, to occupy the building rent free in exchange for the promise to make some repairs.

It was on November 10, 1967 that Pratt and Griffith agreed that if Pratt could obtain financing they would jointly run the Penn-Jersey store. Pratt said on deposition in December 1968 that he never talked with Daugherty concerning a loan from the bank until January 16, 1968 after the bank had lent him $30,000 on the strength of considerable collateral, including the Penn-Jersey inventory. He admitted however in the same deposition that in Daugherty's office he had discussed the Daugherty building with him, and that it was after this discussion that Daugherty again was seen in the Kessler building. At trial Pratt fixed the time of his discussion with Daugherty as early December. The directors of the bank tentatively approved the loan to Pratt on November 29 and the executive committee approved it on December 15. Daugherty voted "aye" both times.

In January 1969 the Daugherty building burned. The insurance money was used to pay off the mortgage on it when Pratt and Griffith bought it. The bank made an unsecured loan of $30,000 to Pratt and Griffith in order to effect reconstruction of the building. Merchant testified that Pratt and Griffith had made no payments under their agreement to buy since the fire. Efforts by Kessler to bring out that Daugherty had an interest in a percentage of sales were blocked by the court on objections.

Appellant contends that Griffith's statement to Leonard Kessler were not admissible because there was no evidence apart from the statements that a conspiracy ever existed, appearing to concede, as we think he must, that if a prima facie case of conspiracy is otherwise shown the declarations of one conspirator during the conspiracy are the declarations of each conspirator. The

law was said to be in *Checket-Columbia Co. v. Lipman,* 201 Md. 494, 502: "The law considers that when persons join in an unlawful enterprise, the acts done and the words spoken during the existence of the enterprise are the acts and words of all of them."

In a civil case not involving a criminal act, conspiracy may be shown by a preponderance of the evidence and may be proved by circumstantial evidence since almost never is direct evidence available. Conspiracy may be shown by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design. *Western Maryland Dairy v. Chenoweth,* 180 Md. 236, 243.

In essence the rule is that the plaintiff may prevail if men of sound mind may reasoningly and reasonably deduce from the facts and circumstances presented to them that there was a conspiracy. We think that under the tests we have recited, the facts and circumstances in this case, apart from Griffith's statements to Leonard Kessler, showed prima facie a conspiracy between Pratt, Griffith and Daugherty and that this made the admission of Griffith's statements, concededly made during the course of the conspiracy, proper. See 16 Am. Jur. 2d, *Conspiracy* § 61; *McCormick on Evidence* (1954), Admissions § 244, p. 522; *Rent-a-Car Co. v. Globe and Rutgers Fire Ins. Co.,* 161 Md. 249.

In an action for the tort of conspiracy the damages recoverable are those which proximately result from the wrongful conduct. *Kimball v. Harman,* 34 Md. 407. Kessler proved that he made every effort to mitigate damages after Pratt and Griffith vacated the premises by personal solicitation, newspaper advertising and the services of a real estate man. He did rent the store to one Hayden, who there operated an automobile and appliance discount store, similar to the Penn-Jersey opera-

tion, for $350 a month with an option to purchase at the end of three years. Hayden testified he intended to exercise the option to buy. Pratt and Griffith paid three months rent or $1,050. Hayden's rent would total $12,-600. Obviously, the jury deducted $13,650 from $42,000, the total which a rent of $350 a month for 120 months produces, and gave judgment for $28,350. Under the proof and the charge to the jury, we find no error in this.

> *Judgment against Daugherty modified by striking the punitive damages of $7,-000 and as modified to a judgment for one cent affirmed; judgment against Pratt, Griffith and Daugherty modified by striking the punitive damages of $15,000 and as modified to a judgment for $28,350 affirmed; costs will ·be paid by appellant.*