723 A.2d 529

**Alfred Neil KRAMER**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al.**

**No. 532, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Jan. 28, 1999.

618

620

Daniel J. Earnshaw (Earnshaw & Wright, LLC on the brief), Edgewood, for appellant.

Robert B. Levin (Frank C. Derr, Deputy City Solicitor and Michael G. Raimondi on the brief), Baltimore, for appellees, Mayor, Schmoke and Janey.

Philip S. Roberts, Bel Air, for appellees, Rehrman, Crofoot and Harford County.

Argued before DAVIS, SALMON and SONNER, JJ.

SALMON, Judge.

Beginning in 1988, Alfred Kramer (Kramer) was employed as an attorney by the Mayor and City Council of Baltimore ("the City"). Kramer also had a part-time private law practice. As a private practitioner, Kramer brought two suits against Harford County. In the lawsuits, Kramer asserted on behalf of his clients that a road-improvement fee, imposed by Harford County as a condition for the development of real estate, was an illegal tax.

Neal Janey (Janey), at all times here pertinent, was the Baltimore City Solicitor and Kramer's boss. In June 1994, after discussing the matter with Ernest Crofoot (Crofoot), the County Attorney for Harford County, Janey gave Kramer an ultimatum, viz: either drop his representation of the plaintiffs in the actions against Harford County ("the County") or be fired from his job with the City. Kramer decided to keep his job with the City and, accordingly, agreed to cease participation in the actions against the County.

In November of 1995, some eighteen months after Kramer had agreed to divorce himself from the suits against the County, Janey fired Kramer. According to Kramer, he was fired because the lawsuit against the County had caused "political harm" to Eileen Rehrmann (Rehrmann), the County Executive for Harford County, who was a "political ally" of Kurt Schmoke (Schmoke), the City's mayor and Janey's boss.

Kramer filed suit in the Circuit Court for Baltimore County against the City, Schmoke, Janey, Harford County, Rehrmann, and Crofoot. In his amended complaint filed on September 23, 1997, the City was sued for the (allegedly) wrongful discharge of Kramer (Count 1). All defendants were alleged in Count 2 to have engaged in a conspiracy against Kramer. All defendants were also sued for interfering with the advantageous economic relationship that Kramer enjoyed with his clients who had sued the County (Count 3); and Rehrmann and Harford County were alleged in Count 4 to have tortiously interfered with the employment contract between Kramer and the City.

Discovery was completed by the parties after which all defendants moved for summary judgment as to liability. Kramer filed an opposition to the motion, but after a January 7, 1998, hearing, Baltimore County Circuit Court Judge J. Norris Byrnes granted summary judgment in favor of all defendants. Kramer filed this timely appeal.

## QUESTIONS PRESENTED

1. Did the trial judge err in granting summary judgment in favor of the City as to Count 1?

2. Did the trial judge err in granting summary judgment in favor of Rehrmann and Harford County as to Count 4?

3. Did the trial judge err in granting summary judgment in favor of all defendants as to Count 3?

4. Did the trial judge err in granting summary judgment in favor of all defendants as to Count 2—the count alleging that the defendants had entered into a conspiracy against Kramer?

## STANDARD OF REVIEW

Appellate review of the grant of summary judgment is governed by Maryland Rule 2-501(e). Summary judgment is proper if "there is no genuine dispute as to any material fact

and ... the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). "In determining whether a party is entitled to judgment under this rule, the court must view the facts, including all inferences, in the light most favorable to the opposing party." *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995); *see also Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 739, 625 A.2d 1005 (1993). The role of the trial court is to decide issues of law and not to resolve disputed issues of fact. *See DeBusk v. Johns Hopkins Hosp.,* 105 Md.App. 96, 102, 658 A.2d 1147 (1995), *aff'd,* 342 Md. 432, 677 A.2d 73 (1996). Summary judgment proceedings are not intended as a substitute for trial. *See General Accident Ins. Co. v. Scott,* 107 Md.App. 603, 611, 669 A.2d 773 (1996). Upon review of summary judgment matters, an appellate court determines whether the trial court was legally correct. *DeBusk,* 105 Md.App. at 102, 658 A.2d 1147.

## FACTS[1]

Alfred Kramer was hired as an attorney for the City after Janey recommended his appointment. He started his career in the City Solicitor's office as an "Assistant City Solicitor II" and was promoted to "Assistant City Solicitor III" in August of 1990.

While Kramer was employed by the City, attorneys were allowed to have private part-time law practices but were prohibited from representing clients who had a claim pending against the City or who were defendants in criminal cases. Also, as a matter of practice, if an attorney in the City's law department had a question as to whether an outside practice might pose a potential conflict with their City employment, they were required to obtain approval of the representation by disclosing the matter to Janey's second-in-command, who, at all times here pertinent, was Deputy Solicitor Otho Thompson.

---

1. The facts are set forth in the light most favorable to Kramer, the non-movant. *See* Md. Rule 2–501. Many of these facts are disputed.

Kramer, in 1991, was retained to assist Joseph Wielepski and Mr. and Mrs. Stanley Wielepski ("the Wielepskis") in subdividing property the Wielepskis owned in Harford County. In the course of obtaining all the necessary County approvals, the Wielepskis learned that, in exchange for approval of the subdivision, they would be required to pay the County approximately $97,000 for future improvements of the two public roads bordering their property. The $97,000 estimate was based on the anticipated cost of improving the roads to meet County standards. After learning of the estimated charges, the Wielepskis signed a Preliminary Plan Approval letter that advised them that they would have to pay the cost of road frontage improvements.

The Harford County Director of Administration then imposed road improvement fees on the Wielepskis. The Wielepskis appealed the director's imposition of fees decision to the Circuit Court for Harford County. The circuit court entertained the "appeal" and affirmed the Director of Administration's decision. The Wielepskis, represented by Kramer and William Phelan, another lawyer employed by the City Solicitor's office, appealed the affirmance. We reversed the judgment of the circuit court, holding that the imposition of the fee was an unauthorized tax. *See Wielepski v. Harford County*, 98 Md.App. 721, 731, 635 A.2d 43 (1994). The Court of Appeals in *Harford County v. Wielepski*, 336 Md. 281, 282, 648 A.2d 192 (1994), vacated our judgment and remanded the case to us with directions to remand the matter to the Circuit Court for Harford County, because the Wielepskis' action in the circuit court and their subsequent appeal to this Court was not authorized by law. *See id.*

Ten months elapsed between the January 5, 1994, decision by this Court in *Wielepski* and the vacation of the judgment by the Court of Appeals. In the interim, Kramer, joined by Phelan and Associate City Solicitor James Ruckle, brought another suit on behalf of the Wielepskis against Harford County. The case was based upon our *Wielepski* decision. Plaintiffs alleged that all fees, similar to those that had been charged to the Wielepskis, were illegal taxes. The complaint

asked the court to certify the case as a class action. Prior to bringing this new lawsuit, both Kramer and Ruckle consulted with Deputy City Solicitor Thompson to make sure that the City did not object to their representation. Thompson told Kramer and Ruckle that he saw no problem with their taking the case and gave permission for them to file suit if they desired to do so.

The class action suit was brought on January 17, 1994, in the Circuit Court for Harford County. The only named plaintiffs were the Wielepskis, but the suit alleged that at least 250 persons and/or entities who had sought to develop in excess of five lots in the County had been required to pay an illegal tax as a condition of receiving necessary zoning approvals. The Wielepskis sued individually and as members of the class that had been forced to pay the illegal tax.

Sometime in January 1994—it is not clear exactly when— Janey became aware that Kramer, Phelan, and Ruckle had filed the class action suit in Harford County. Janey took no immediate action, however. In late May or early June 1994— again, the exact date is not known shown in the record—the County Attorney for Harford County, Ernest A. Crofoot, contacted Janey to complain to him about the involvement of the three assistant Baltimore City solicitors in the class action lawsuit. Crofoot and Janey met in regard to this matter at Janey's Baltimore City Hall office on June 6, 1994. Crofoot gave Janey copies of pleadings and other filings in the Wielepski class action suit, as well as in the earlier lawsuit that had been decided by this Court. On the same day as the meeting with Crofoot, Janey sent Schmoke a memo in regard to the Wielepski suits, which said, *inter alia:*

I think this is clearly the last straw with respect to outside practice. It is astonishing that governmental attorneys employed by the city would be suing a sister subdivision of the State. Harford County, as you know, is a partner with the City in the Northeast Maryland Waste Disposal Authority. The County is a participant with the City in the Baltimore Metropolitan Council. In addition, the County is a co-defendant in the proceedings that have

been initiated by the Susquehanna River Basin Commission concerning the City's allocation of water to Harford County. I was recently informed by George Balog, Director of Public Works, that Harford County is in the middle of negotiations with the City for the purchase of water.

Aside from the more obvious questions concerning propriety, judgment and discretion, and potential conflicts of interest, this case clearly demands that we take more stringent actions with respect to our policies concerning the outside practice of law. I will deal with those policy questions after I have resolved the matter concerning the pending litigation.

The next day, June 7, 1990, Janey sent a letter to Crofoot thanking him for his cooperation in connection with "the inquiry that we are conducting into the conduct and activities of three Baltimore Law Department attorneys who are representing plaintiffs . . . [in] their private practice in two major lawsuits against Harford County." Janey said in the June 7th letter that he had briefed Mayor Schmoke on June 6th and both he and Schmoke were "stunned" when they learned of the Wielepski lawsuits. He advised Crofoot that he would be meeting on June 10th with the three attorneys involved in the lawsuits so that they could "explain their conduct and activities"; he also said that following the June 10th meeting he would consult with Schmoke and his chief of staff and determine the appropriate action to be taken.

True to his word, on June 10, 1994, Janey met with Kramer, Phelan, and Ruckle. The three were told that if they did not withdraw from the suits against Harford County they would be terminated as City employees. Kramer, as well as his two colleagues, all agreed to discontinue their representation of the plaintiffs in the suits against the County. On June 15, 1994, Janey wrote Crofoot and announced the good news. He said:

I have been informed by all three of the attorneys on our staff who have been representing clients in the *Wielepski* cases that they will voluntarily withdraw from both cases.

Other private counsel will be substituted to represent those clients in the cases.

Approximately one year after he agreed to withdraw from the actions against Harford County, Kramer was promoted to Solicitor IV. This promotion was in recognition of his excellent job performance.

Kramer, Phelan, and Ruckles again met with Deputy Solicitor Thompson shortly after their June 10th meeting with Janey. Thompson agreed with the three attorneys that, even though they were withdrawing from the Wielepski cases, they could still protect their interest in any fee that might be realized for the work they had performed already on behalf of the Wielepskis.

New counsel entered their appearances for the plaintiffs in the class action suit in late 1994. Kramer did not, however, formally withdraw his appearance in that matter until after he was fired by the City in November 1995.

On November 21, 1995, Crofoot phoned Janey and told him that it appeared that Kramer might still be involved in the class action lawsuit. Crofoot advised that Harford County had made a settlement offer in the suit to Richard Jacobson, one of the attorneys who had taken over the class action suit from Kramer, Phelan, and Ruckle. Mr. Jacobson advised the County that he would have to consult with Kramer before giving approval of the settlement.

This information from Crofoot caused Janey to write a memorandum to all attorneys in the City Solicitor's office. The memorandum, dated November 22, 1995, read, in part, as follows:

THIS IS A POLICY MEMO REGARDING THE OUTSIDE PRACTICE OF LAW THAT APPLIES TO ALL ATTORNEYS OF THE LAW DEPARTMENT. IT IS EFFECTIVE IMMEDIATELY. PLEASE READ THIS MEMO PROMPTLY. MARK THE APPLICABLE LINE BELOW, SIGN AND RETURN THIS MEMO TO ME.

1. No attorney who is a full-time or part-time employee of the Baltimore Law Department may, on behalf of any private party, sue, file an action against, or be involved *directly or indirectly* in any litigation, proceedings, transactions or negotiations involving any interests of the City of Baltimore; the State of Maryland; *a political subdivision of the State of Maryland;* a county, municipal or local government in Maryland; a department, agency, board, commission, instrumentality, unit or public body of the City, of the State, or of a county, municipal or local government in the State; or, an official or employee of the city, of the State, of a political subdivision or of a county, municipal or local government with respect to his or her official or employment capacity.

(Emphasis added.)

The memorandum instructed all recipients to notify Janey immediately and in writing if they were currently handling any cases that might come within the prohibition mentioned in the memorandum. Kramer responded to the November 22 memorandum by saying that he was no longer participating in the Harford County class action lawsuit but that he was "merely protecting my previous fee [in that lawsuit], as agreed to with Otho Thompson." [2] Janey wrote to Kramer on No-

---

**2.** Phelan's response was as follows:

> Pursuant to your memo of November 22, 1995 addressed to all attorneys, I wish to report on one case, *Wielepski v. Harford County.* I have had no involvement in this case since our conference about 1½ years ago and I do not anticipate any future involvement. In the event that the current attorneys ever negotiate a settlement or win a judgment, they might possibly send me a fee for my work on the case in early 1994 before our conference. I have no contact or agreement with the attorneys and I have no real expectation of ever receiving anything.

Ruckle's response to the memorandum insofar as it dealt with the class action suit was:

> Since our meeting approximately one year ago, I have not actively participated in this matter in accordance with your instructions. In the event the plaintiffs settle the case or a trial results in judgment against the county, I may receive some compensation for the work I did on the case prior to withdrawing my participation.

vember 27, 1995, after receiving Kramer's response. Janey said, in pertinent part:

When I met with you, Bill Phelan and Jim Ruckle several months ago to discuss the involvement of the three of you in *Wielepski v. Harford County,* I made it clear to all of you that I felt it was inconsistent with the interests of the City and the Mayor for a full-time attorney of the Baltimore Law Department to be involved in legal matters concerning the State or any local governments in Maryland. You vigorously protested my position because we had not adopted a formal policy on that subject.

My response to you and the other two attorneys was that it was not necessary for us to have a formal policy. Common sense had to tell you that Law Department attorneys could not be involved in such matters, or have financial interests in such matters, because they could interfere with the political relations of the Mayor with the Governor or with various chief executives of the local governments throughout the State. Such actions also could come into conflict with any agreements or covenants between the City and other jurisdictions.

Specifically, with respect to Harford County, I told you and the other two attorneys that, in my opinion, it would be a direct conflict of interest for any attorney on this staff to be involved in an adversarial proceeding against Harford County. Harford County is a partner with Baltimore in the Northeast Waste Disposal Authority and certain other compacts involving the environment and environmental regulation. In addition, I told the three of you that Harford County purchases its water from Baltimore, and that it was in negotiations with our Department of Public Works to renew its contract for its water supply. An Assistant Solicitor is working on that matter at this time. It is a matter that probably must go to the Board of Estimates for final approval.

Furthermore, I told the three of you that the County Executive of Harford County was upset that Law Department attorneys were suing her county on behalf of private clients for damages, and that she planned to file a protest

with the Mayor. Moreover, the three of you were told that the issues raised in the suit were embarrassing to the County Executive and her administration, and became political issues in her campaign for re-election to office.

In the letter Janey went on to say that he was stunned to find out that Kramer was still protecting his fee in the class action suit. Janey opined that

[t]here is no such thing as having a fee, or as you say 'protecting my previous fee,' in a matter that is a conflict. You were advised of this conflict by me, not by the Deputy City Solicitor. Thus, your agreement with him is totally irrelevant.

Later in the letter, Janey said:

This matter came to light on Tuesday, November 21, when the County Attorney for Harford County called and asked whether you were still involved in the *Wielepski* case. I told him that you have informed us that you were withdrawing from the case and would have no involvement in it. Apparently, one of the attorneys who has an appearance entered in the case discussed a settlement with the County Attorney. When the County Attorney tried to finalize a settlement, he was told that nothing could be done in the case without consultation with you. Now that I have received your report, I suppose I understand why the attorney made the representation that he did to the County Attorney. Apparently, protecting your previous fee means that you are being consulted, *and that you are giving advice and direction.*

The County Attorney has a right to know who the attorneys are who are involved in the case and making the decisions about settlement. He may, if necessary, file a petition in the Circuit Court for Harford County to compel you to disclose what your interests are in the case, as well as your involvement. Before doing that, he contacted me so that I could make an effort to determine what is going on.

(Emphasis added.)

Janey concluded the letter by saying that Kramer should not

take this letter to mean that I am directing you to sever your ties with the clients or the attorneys, or directing you to give up your fee. I do not have the authority to direct either type of action. I do not want this letter to be misconstrued by you as an attempt by me to interfere with your relation with your clients or the attorneys.

Finally, Janey advised that if Kramer wished to discuss the matter with him he should do so no later than the end of the November 29, 1995, business day and that, if the discussion had not taken place by then, he planned to take appropriate action.

On November 29, 1995, Janey terminated Kramer—with January 5, 1996, as the effective date of the termination. Janey said in his November 29th letter to Kramer that he (Kramer) was being "laid off." The reasons for the layoff were alleged to be "budgetary and fiscal constraints and the implementation of reorganization initiatives." Janey further advised that the action was taken due to "no fault of your own." Despite what was said in the letter, Kramer was fired—not laid off. The reasons for Kramer's firing had nothing to do with reorganization or fiscal constraints.

After all defendants filed their motions for summary judgment, Kramer filed an affidavit in opposition,[3] which read, in pertinent part:

---

**3.** As to Harford County, Crofoot, and Rehrmann, it is doubtful, if this case had been tried, that the contents of the affidavit would have been admissible against them because it was hearsay that did not come within any exception. The trial judge was aware of this when, in his oral opinion granting summary judgment, he noted that he was familiar with the case of *Daugherty v. Kessler*, 264 Md. 281, 286 A.2d 95 (1972). The *Daugherty* case stands for the proposition that in applying the co-conspirators' exception to the hearsay rule a party may not prove the conspiracy by statements contained in the out-of-court statement itself. *See id.* at 291–92, 286 A.2d 95.

On July 1, 1994, the new Maryland Rules of Evidence became effective. Maryland Rule 5–803(a)(5) excludes from the hearsay rule "[a] statement that is offered against a party and is . . . (5) A statement by a co-conspirator of the party during the course and in furtherance of the conspiracy."

6. In 1994 Neal Janey, Chief Solicitor, told me that he was told by Mayor Kurt Schmoke that Schmoke had had a conversation the prior evening at a fund-raiser for Senator Sarbanes with Eileen Rehrmann, who was then running for re-election as Harford County Executive. He later said that Rehrmann told Schmoke that my representation against Harford County in the *Wielepski* case was "hurting her politically" and that she wanted me to drop the lawsuit.

7. I reminded Mr. Janey that I had gained approval for the representation by Mr. Thompson and that I was representing citizens who had been wronged unlawfully and intentionally by Harford County Government. I also asked him to explain to me any ethical conflict he felt existed.

8. He responded by saying that this is what "Rehrmann and Schmoke want to happen" and said that nothing else mattered. That Rehrmann and Schmoke were "political allies" and whether or not Wielepski or others had been wronged by the County was "not the issue."

9. Mr. Janey told me that he had met with Mr. Crofoot. He said Mr. Crofoot explained that he had been sent by

---

The Committee Note to Rule 5–803(a)(5) points out that the new rules do not address whether the court can consider the statement sought to be admitted in making the preliminary determination as to the existence of a conspiracy. Professor McLain observes, however, that

> [t]he Rules Committee was of the opinion that Maryland should retain the common law on this point, not only as to the co-conspirator exception but as to all the foundational requirements in section [5–104(a)], so that the proponent of the evidence would not be allowed to "bootstrap" the foundational requirement by proof contained in the hearsay statement itself. A Committee note makes clear that this issue is left to development through the Maryland case law. Post *Bourjaily[ v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987),] decisions by other states have gone in both directions.

Lynn McLain, *Maryland Rules of Evidence* § 2.803.4(a), at 251 (1994).

Judge Byrnes assumed, for purposes of the motion, that Kramer could "bootstrap" his conspiracy argument by relying on the out-of-court statements themselves to prove the conspiracy. He ruled, however, that whether the affidavit's contents were admissible made no difference because the plaintiff did not have sufficient evidence to prove any of the four torts mentioned in the amended complaint even if he considered the contents of the affidavit.

Rehrmann to complain, and that I was "out of the case or out of a job." He said that Mrs. Rehrmann's political opponent was making an issue out of the *Wielepski* case. He said that Mr. Crofoot reminded Mr. Janey that his visit and Mrs. Rehrmann's position had the full support of Mayor Kurt Schmoke.

10. In a later conversation, Mr. Janey told me that Mr. Crofoot, at Mrs. Rehrmann's request, had called to question why I was still working on the case (although I wasn't) and why they (The City, Mr. Schmoke and/or Mr. Janey) had not taken care of it.

11. I was then terminated from employment for these political purposes; but under the guise of a layoff. I was not hired as a political appointee or employee. I was hired as a civil service employee and served as such, through several administrations, until I was terminated on January 5, 1996.

Additional facts will be added in order to address the issues presented.

## ISSUE 1

### Summary Judgment as to the Wrongful Discharge Count

■ Kramer was, at the time of his termination, in the City's civil services "exempt" classification. An employee in that classification serves "at the pleasure of the appointing authority," which, in this case, was the City Solicitor. Thus, appellant was an at-will employee.

■ An at-will employee may be fired for any reason unless the reason violates a clear mandate of the public policy of the State of Maryland.[4] *See Adler v. American Standard*

---

4. In his brief, appellant asserts, as an alternative argument, that he was not an at-will employee. He claims that the resolution passed by the Civil Service Commission making his and other city solicitors exempt employees was "invalid to the extent of [a]ppellee[']s claim that Kramer could be fired at will." Appellant cites no authority nor does he make any argument in support of this contention. He thus violates Maryland

*Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981). Appellant contends that his firing did violate a clear mandate of public policy, and in support of this argument, he relies on Article VII, section 118(a) of the City's Charter. Section 118(a) reads as follows:

> No person shall be discharged from the Classified Civil Service or be reduced in pay or position or suspended by the appointing officer or on account of political opinions or affiliations, or for refusing to contribute to any political fund or refusing to render any political service, but nothing in the provisions of the charter relating to the Classified Civil Service shall forbid the removal, dismissal, reduction, or suspension of any such officer or employee for any just cause....

■ First of all, provisions of the City's Charter do not rise to the level of a "public policy" of this State. The policy must be statewide, not merely applicable in the City. The City Charter provision invoked by Kramer does not apply statewide—it applies to some, but not all, City government employees, i.e., those who are members of the City Classified Civil Service.

But even assuming, *arguendo*, that section 118(a) of the City's Charter does provide a clear mandate of this State's public policy, the record is silent as to what Kramer's political beliefs or affiliation might be, and there simply was no proof presented to show that Kramer was fired because of his political beliefs or affiliations or that he was ever forced to make any "political contribution."

Appellant maintains in his brief that he was fired for refusing to render a political service to Rehrmann. He posits that the political service he failed to render was his refusal to disassociate himself completely from the class action lawsuit.[5]

---

Rule 8–504(a)(5). *See Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994). Due to this violation, we will not address this alternative argument.

**5.** Appellant's argument seems at times to face in two directions simultaneously. In his affidavit, he says he was not, at the time he was fired,

How Rehrmann, in November 1996, would have benefitted politically if Kramer had disassociated himself from the class action suit is a mystery. There are no allegations that the attorneys who replaced Kramer as counsel for the class action plaintiffs were less competent than Kramer or that the threat of a huge judgment against the County would have been in any way diminished if Kramer withdrew. From all that is shown in the record, Rehrmann was no better or worse off politically whether Kramer stayed or left as plaintiffs' counsel in the suit against Harford County. The suit against the County was never dropped, and no defendant in the case *sub judice* ever asked that it be dropped.

Kramer was fired because Janey believed that Kramer was still "protecting his fee" in the Wielepski class action suit by giving "advice and direction" to the plaintiffs' attorney in that matter. Janey also believed that giving advice and direction to the Wielepskis or their lawyers violated a promise that Kramer had made to Janey to withdraw from the case.

█ Kramer does say in his affidavit, in effect, that he did not break his promise to Janey because after June 1994 he was not actively participating in the case. Janey may have been wrong in his belief that Kramer had broken his promise; but right or wrong, he still had a right to fire Kramer if he had ground to believe that Kramer had broken his promise. Based on what Janey had learned from Crofoot, Janey clearly had reason to believe that Kramer was still giving advice and direction to those who were suing Harford County.

█ In his brief appellant points to nothing in the record to show that he was fired due to anything prohibited by Article VII, section 118, of the City Charter. He does claim, however, that he was fired for "political reasons" and argues that this is prohibited by the Charter. This claim is baseless.

---

still working on "the Wielepski matter." He nevertheless appears to argue that he was fired because he *was* working on the lawsuits.

The firing of an at-will employee due to "political reasons" simply is not prohibited by the Charter.[6]

A substantial portion of appellant's brief is devoted to proving that his firing was unfair. Taking the evidence in the light most favorable to Kramer, a jury might very well believe that his firing *was* unfair. Kramer did a good job for the City. And, he was told by Janey's deputy, Thompson, that he could represent the Wielepskis. After Kramer's June 10, 1994, meeting with Janey, Kramer was assured by Thompson that he could still protect his fee in the class action suit. At bottom, Kramer was fired because Janey disagreed with Thompson's opinion. In Janey's view, Kramer had a conflict in representing the City while also representing clients who were suing a municipal corporation with which the City had close relations. Janey believed that one could not "protect one's fee" in a case in which the attorney had a conflict in the first place. Kramer and Deputy City Solicitor Thompson may have been one hundred percent correct in believing there was no conflict in representing the City and the Wielepskis, but Janey, even if misguided, had the right to fire Kramer so long as the firing did not violate some clear mandate of public

---

**6.** After appellant was "laid off," he received a brochure from the City that said: "As a permanent employee of the City of Baltimore who has been laid off, you are entitled to certain benefits. [The] fact sheet [attached] outlines these benefits and provides other information concerning your status." The brochure then goes on to list the benefits to which he was entitled. In his brief, appellant makes reference to the brochure, as follows:

Further, when Kramer was discharged, he received a brochure prepared by the Mayor and City Council, his employer, which identifies him as a "Permanent Employee." Thus, the employer was, at the least, restricted in firing Kramer for political considerations, which is alleged repeatedly in Kramer's Complaint and Amended Complaint. It is *Kramer* who was entitled to partial summary judgment on this issue as there can be no dispute that Kramer was protected by the City Charter from political firings.

(Emphasis in original.) Appellant does not argue that the statement in the brochure meant that he was not an at-will employee, nor does he otherwise explain how designation as a permanent (as opposed to a temporary) employee would mean that he could not be fired due to "political considerations."

policy. Because Kramer presented no proof that his firing violated any clear mandate of public policy, the trial judge did not err in granting summary judgment as to Count I.

## ISSUE II

In Count IV, Kramer alleges that Harford County and Rehrmann interfered with his contract of employment with Baltimore City and that the interference led to his firing.

 There is a distinction between actions for intentional interference with contract and actions for intentional interference with economic relations. *See Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296–98, 639 A.2d 112 (1994); *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69–70, 485 A.2d 663 (1984). The former action requires proof that a valid existing contract was interfered with, *see Fraidin v. Weitzman*, 93 Md.App. 168, 189, 611 A.2d 1046 (1992); *Fowler v. Printers II, Inc.*, 89 Md.App. 448, 466, 598 A.2d 794 (1991), while the latter pertains to prospective business relations, or to contracts terminable at will, *see Macklin*, 334 Md. at 299, 639 A.2d 112. The actions also differ in that the right of an individual to interfere, which is narrowly restricted in an interference with contract action, is treated more broadly in an action claiming interference with economic relations. *See Macklin*, 334 Md. at 298, 639 A.2d 112; *Natural Design*, 302 Md. at 69–70, 485 A.2d 663.

 Because Count IV deals with the alleged interference with a contract at will, we are required to construe that count as a claim for intentional interference with economic relations. *See Macklin*, 334 Md. at 299, 639 A.2d 112. In order to establish a prima facie case of intentional interference with economic relations, a plaintiff must prove:

(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[ ] in [his] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Natural Design,* 302 Md. at 71, 485 A.2d 663 (quoting, *Willner v. Silverman,* 109 Md. 341, 355, 71 A. 962 (1909)).

The Court of Appeals has defined the wrongful or unlawful acts necessary to support the tort of interference with economic relations as follows:

[W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and "violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith."

*Alexander & Alexander, Inc. v. B. Dixon Evander Assocs., Inc.,* 336 Md. 635, 657, 650 A.2d 260 (1994) (citing *K & K Management v. Lee,* 316 Md. 137, 166, 557 A.2d 965 (1989)) (quoting Prosser, *Law of Torts* § 130, 952–953 (4th Ed.1971)).

It is indisputable that Kramer was not fired for anything Rehrmann or Crofoot did or failed to do prior to June 10, 1994. Prior to June 10th, all Rehrmann or Crofoot did was protest, albeit in strong terms, Kramer's involvement in the class action suit and demand that Kramer be given a choice of either giving up his job with the City or his representation of plaintiffs who were suing Harford County. As a result of their protests and demands, Kramer was not fired—he was simply given an ultimatum.

After June 10, 1994, Crofoot called Janey (the date of the call is not shown in the record) and told him about an incident that took place when the Wielepskis' case was argued in the Court of Appeals. One of the judges (Crofoot believes it was Judge Eldridge) asked Mr. Jacobson, the Wielepskis' counsel, why the Court should not dismiss the case for lack of jurisdiction. After attempting to answer the question, Mr. Jacobson said he would have to discuss the issue with his client. Jacobson then walked to the back of the courtroom and shortly thereafter returned to the podium and said words to the effect: "You are probably right [about the court's lack

of jurisdiction], but Mr. Kramer wants to know if you would" consider a certain County regulation. Crofoot believed it odd that Kramer, who was supposed to be out of the Wielepski case, would still be giving advice to Jacobson, and he reported this incident to Janey.

Crofoot's only other involvement after June 10, 1994, was that he, on November 21, 1995, called Janey and complained that when a County Attorney for Harford County had tried to settle the Wielepski class action case Mr. Jacobson said that he would have to consult with Kramer before making a decision as to the settlement.

What Crofoot said to Janey after June 10, 1994, may have indirectly led to Kramer's termination, but appellant failed to produce any evidence that Crofoot's actions after June 10th were "independently wrongful or unlawful." The absence of such evidence is fatal to a suit for wrongful or malicious interference with business relationships. *See Alexander,* 336 Md. at 657–58, 650 A.2d 260. There was no evidence that what Crofoot told Janey about the episode at the Maryland Court of Appeals was untrue or that Crofoot had intentionally or recklessly misrepresented what he had learned (second-hand) about the remarks Jacobson made regarding Kramer when the County offered to settle the class action suit. Crofoot had a legitimate right to bring Kramer's apparent participation in the class action suit to Janey's attention because Janey had told Crofoot, back on June 15, 1994, that the City's attorneys would voluntarily withdraw from the suit.

Kramer does say in his affidavit that Janey told him that Crofoot, at Rehrmann's request, "had called [Janey] to question why I was still working on the case (although I wasn't) and why they (the City, Schmoke, and/or Mr. Janey) had not taken care of it." While it may be true that Kramer was, in fact, not "working" on the Wielepski cases after June 1994, Kramer's actions at the Court of Appeals, which were never denied, coupled with the fact that he was being consulted in regard to settlement of the class action suit, would, at a bare minimum, give the appearance that Kramer still had not completely divorced himself from the litigation. Crofoot,

therefore, would clearly have ground to at least "question" Kramer's involvement. In sum, Kramer failed to show that he could produce evidence that either Rehrman or Crofoot engaged in independently wrongful or unlawful conduct. The trial judge did not err in granting summary judgment as to Count IV.

## ISSUE III

In Count III, Kramer alleged that all the defendants intentionally interfered with the economic relationship he had with the class action plaintiffs.

### A. *The City, Schmoke, and Janey*

These defendants never told Kramer that he could not represent the class action plaintiffs. They simply gave Kramer a choice, either give up the class action lawsuit or give up his job as a lawyer for the City. To prove this tort, appellant was required to prove that the acts by Janey, Schmoke, and/or the City were "independently wrongful or unlawful." As already demonstrated, wrongful or unlawful acts "include common law torts, and ' "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threats of groundless civil suits or criminal prosecution in bad faith." ' " *Alexander*, 336 Md. at 657, 650 A.2d 260 (citing *K & K Management*, 316 Md. at 166, 557 A.2d 965). The City, as well as Schmoke and Janey, had the right to regulate what, if any, private practice cases Kramer could involve himself in while he worked for the City. There plainly would have been nothing "wrongful" or "unlawful" if the City had required its lawyers to drop all private cases. If Kramer did not like the restrictions placed on his employment, he was free to leave his City job and continue to represent the Wielepskis. Kramer submitted no proof that either Schmoke, Janey, or the City acted either wrongfully or unlawfully when they gave him this ultimatum.

### B. *Rehrmann, Crofoot, and Harford County*

According to Kramer's affidavit, Rehrmann did the following concerning the Wielepski suit: (a) she told Schmoke

that having attorneys who represented Baltimore City also representing the plaintiffs in the Wielepski case was "hurting her" politically; (b) she told Schmoke she wanted Kramer to get out of the lawsuit; (c) she sent Crofoot to complain to Janey; and (d) she told Crofoot to tell Janey that Schmoke and she both wanted Kramer to either give up his City job or cease representing the class action plaintiffs.

It will be noted that Rehrmann made no direct threats to Kramer nor did she indirectly threaten him by sending Crofoot to deliver any threats. She merely sent Crofoot to deliver the message to Janey that she wanted Kramer to "drop" (i.e., get out of) the Wielepski lawsuit. As already mentioned, both Janey and Schmoke had a right to demand of City lawyers that if they wanted to continue to work for the City then they should discontinue participation in lawsuits against other municipal corporations. Thus, there was nothing "unlawful" or "wrongful" in Rehrmann's conduct in lodging her complaint or in saying she wanted Kramer either to stop representing the City or withdraw from the Wielepski suits. The same is true of Crofoot, who delivered Rehrmann's message. Because the only agents of Harford County who are alleged to have participated in the tort of interference with Kramer's relationship with the class action plaintiffs are Rehrmann and Crofoot, and because Kramer presented no evidence that either agent acted wrongfully or unlawfully, Harford County has no liability as to Count III. The trial judge did not err in granting summary judgment as to all defendants as to this count.

## ISSUE IV

 Count II alleges that all defendants conspired to (a) wrongfully discharge him, (b) interfere with his advantageous economic relationship with the class action plaintiffs, and (c) interfere with his contract of employment with the City of Baltimore. Civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence

of other tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038 (1995) (quoting *Alexander*, 336 Md. at 645 n. 8, 650 A.2d 260).

Civil conspiracy is a parasite tort—it cannot stand alone. *Id.* Here appellant cannot recover for the tort of conspiracy since he failed to show he had sufficient evidence to prove liability for any of the underlying torts mentioned in Counts I, III, and IV. As a parasite tort, Count 2 therefore fails.[7]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

7. Appellant claims that Janey acted hypocritically because in 1990, another City attorney, as part of his private practice, was allowed to represent Janey's wife in a matter before a City agency, the Board of Election Supervisors for Baltimore City. When newspaper reporters made inquiry in 1990 of Janey about the propriety of having Janey's wife being represented by a lawyer for the City, Janey took no adverse action against his wife's attorney. Appellant on appeal argues: "The lower court erred in ruling that a past policy of the Mayor and City Council and Janey inconsistent with their actions in terminating Kramer would be inadmissible at the trial of this matter." Whether the court's advance ruling was right or wrong is here immaterial because there will be no trial. Moreover, evidence as to how Janey handled a previous case where an attorney in the City Solicitor's office breached a rule of the law office could have no bearing on whether the trial judge erred in granting summary judgment.