**Esther MULLINS, Plaintiff,**

v.

**The INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 77 AFL—CIO OF WASHINGTON, D.C., et al., Defendants.**

Civil Action No. 01–1465–A.

United States District Court, E.D. Virginia.

Aug. 8, 2002.

Ted G. Yoakam, David Kamp & Frank, L.L.C., Newport News, VA, for plaintiff.

William J. Hardy, Karalekas & Noone, Washington, DC, Robert W. Hesselbacher, Jr., Wright, Constable & Skeen, L.L.P., Baltimore, MD, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff Esther Mullins is a heavy equipment operator who claims she was (i) wrongfully terminated by her employer, (ii) unfairly represented by her union, and (iii) defamed by her employer and fellow employees. All defendants have moved for summary judgment, and because the matter has been fully briefed and argued it is now ripe for disposition.

### I.

Plaintiff Esther Mullins ("Mullins"), a Virginia resident, is a heavy equipment operator who was employed by defendant Cherry Hill Construction ("Cherry Hill"), a Maryland corporation. Mullins is a member of defendant The International Union of Operating Engineers Local No. 77, AFL—CIO of Washington D.C. ("the Union"), a trade union based in Maryland. At the time of the events alleged in the complaint, defendant James A. Openshaw ("Openshaw") was president of Cherry Hill and defendants Cheryl Schmelzle ("Schmelzle") and Yvette Mathis ("Mathis") were employees of Cherry Hill. All three individual defendants maintained Maryland business addresses.

During Mullins's employment at Cherry Hill, the Union and Cherry Hill were parties to a Collective Bargaining Agreement ("the Agreement"). Included in the Agreement are provisions governing the termination of employees and grievance and arbitration procedures. In particular, Article XVI specifies that grievances against the employer on behalf of the employee may only be filed by the Union and that grievances not filed within seven days

of the date of the aggrieved event are waived.[1]

For approximately two weeks in March 2001, Mullins worked on the Lee Road Fairfax County Water Authority project in Fairfax County, Virginia. While there, she worked with the same Cherry Hill crew that she had previously worked with for approximately three and a half months. On March 19, after an argument with a member of this crew, Mullins reported to a Cherry Hill foreman that she had observed crew members using marijuana on the job every day for the entire time she had worked with them. As a result of this report, Cherry Hill took prompt steps the following day to test the crew members for drug use. Two employees tested positive for marijuana and were terminated.

When Mullins returned to work on March 21, she was informed by her foreman that he and the crew members were upset because they knew that she had reported their drug use. The next day, Mullins did not return to the Fairfax County Water Authority, but reported instead to the Cherry Hill office in Maryland. On March 23, she was notified that the members of her crew had either quit or been terminated.

Thereafter, Cherry Hill assigned Mullins to a new worksite at Sansbury Pit, Maryland, to which she reported early Monday, March 26. She stayed there only until 8 a.m., at which time she called Openshaw's secretary and demanded an emergency meeting with Openshaw. When Mullins arrived at Openshaw's office in Jessup, Maryland, she was met by Openshaw's secretary and driven to a nearby diner in Maryland where the meeting occurred.

The record concerning the events of this March 26 meeting is not entirely free of dispute. It is undisputed that in this meeting Mullins told Openshaw of her concern that members of her crew might seek to harm her in retaliation for her report of their drug use. It is also undisputed that Openshaw agreed to pay Mullins for four weeks during which she could seek other employment. What is disputed is whether during the course of the March 26 meeting Mullins was told her employment with Cherry Hill was terminated or would be terminated. Openshaw has consistently stated that he did not tell Mullins during the meeting that she was terminated or that she would be terminated.[2] Mullins's testimony on the first day of her deposition is to the same effect; she stated that during the meeting Openshaw never told her that she was fired or that her employment at Cherry Hill had been terminated.[3]

---

1. Article XVI of the Agreement states, "The nature of the dispute or grievance, and the specific article and section of the Agreement alleged to have been violated, shall be presented in writing by the Union to the Company within seven (7) days from the date on which the grievance arose."

2. Rather, Openshaw has maintained that Mullins informed him that she quit during the March 26 meeting. In his affidavit, Openshaw states, in pertinent part, as follows:

   "During our meeting, Ms. Mullins told me that she feared that former members of her crew would harm her and that she was too afraid to continue to work for Cherry Hill or for any other union contractor. I offered to pay Ms. Mullins four weeks' wages to allow her to stay home and try to collect herself. It was my understanding, based on her statements to me, that she had quit her employment with Cherry Hill. However, I had reached no conclusion at that time as to whether Ms. Mullins might return to Cherry Hill in the future." (Openshaw Affidavit ¶ 4.)

3. Yet, Mullins also claims that she did not quit during the March 26 meeting. Mullins's testimony in this respect was as follows:

   [Mr. Kohlman]: So ... you were certain that you were employed, correct?
   [Mullins]: I was certain that I had not quit.

Yet, on the second day of her deposition, Mullins's testimony changed; she testified that she had been fired by Openshaw on March 26.[4] Similarly, in a post-discovery affidavit filed in opposition to the defendants' summary judgment motions, Mullins claims that on March 26 Openshaw informed her that she was no longer employed by Cherry Hill.[5]

With respect to the shift in Mullins's testimony it is worth noting that the remainder of the record evidence supports Mullins's original statement that she was not told by Openshaw in the March 26 meeting that she was no longer employed by Cherry Hill. First, Openshaw and Openshaw's secretary both testified that Openshaw did not terminate Mullins on March 26. Moreover, on April 3, when Mullins received treatment at a Virginia health clinic, she indicated on the clinic intake form that she was employed at that time by Cherry Hill. Mullins also told her own expert economist during the course of this litigation that her Cherry Hill employment did not end until May 1. And, finally, Mullins's extensive handwritten notes, made contemporaneously with the events of the March 26 meeting, do not mention

that her employment with Cherry Hill ended prior to May 1.

Three days after her March 26 meeting with Openshaw, Mullins met with Robert Horst ("Horst"), the Union's Business Manager, at the Union Hall in Maryland. The record concerning the events of this March 29 meeting are also not entirely undisputed. It is undisputed that in this meeting Mullins told Horst that she had reported her Cherry Hill crew for using marijuana and that Openshaw had offered her four weeks off with pay during which time she could search for other employment. It is also undisputed that Mullins asked Horst about the status of her health and welfare benefits in the event she elected to work non-union during those four weeks and requested that he verify with Openshaw that she would be paid. Yet once again, there is a shift in Mullins's testimony concerning whether she told Horst in this meeting that she had been terminated by Cherry Hill. In the first day of her deposition, she testified that in the March 29 meeting she never told Horst that her employment at Cherry Hill had ended.[6] Mullins also testified that until

[Mr. Kohlman]: All right. And you were certain also that he had not fired you, correct?
[Mullins]: I wasn't certain of anything in his mind.
[Mr. Kohlman]: Well, he never told you?
[Mullins]: He never told me.
(Pl.'s Dep. Vol. I at 24–25.)

**4.** In this regard, Mullins testified as follows:
[Mr. Kohlman]: So you're saying [Openshaw] fired you that day?
[Mullins]: Yes. That's exactly what he did.
[Mr. Kohlman]: And that's what you understood?
[Mullins]: Yes.
[Mr. Kohlman]: And you thought your employment was over that day?
[Mullins]: Yes.
(Pl.'s Dep. Vol. II at 262.)

**5.** In her post-deposition affidavit, Mullins avers, in pertinent part, as follows:

"In my meeting on March 26, 2001 with James Openshaw, Mr. Openshaw made it clear to me that due to the leak of information regarding my report of my fellow Cherry Hill employees for illegal drug use on the Lee Road Fairfax County (Virginia) Water Project, I no longer had a job at Cherry Hill and stated to me that I should seek other employment, I should seek non-union employment, that he would assist me in obtaining non-union employment, and that he would pay me four weeks [sic] wages lump sum." (Pl.'s Affidavit ¶ 2.)

**6.** Mullins's testimony in this respect was as follows:

[Mr. Kohlman]: But you did not tell Mr. Horst that I, Esther Mullins, had been fired on March 26, correct?
[Mullins]: No.

May 1 she believed she was employed by Cherry Hill.[7] But, in the second day of her deposition, Mullins stated that in the March 29 meeting she told Horst that she had been terminated by Cherry Hill on March 26.[8] Similarly, in her post-discovery affidavit, Mullins avers that on March 29 she told Horst about her termination.[9]

Here, again, it is worth noting that the remainder of the record evidence supports Mullins's original statement that she never told Horst in the March 29 meeting that she was no longer employed by Cherry Hill, nor did she convey to him that she wanted the Union to file a grievance on her behalf concerning any termination. Horst testified consistently that in the March 29 meeting Mullins made no request that the Union initiate a grievance on her behalf[10] and indeed never told him she had been terminated until May 10 or 11.[11] All that Mullins states on this issue is found in her affidavit where she avers that she cannot recall whether Horst used the word "grievance" in the March 29 meeting, but that she specifically remembers him using the word "arbitration." She does not aver that she asked Horst to file a grievance. Furthermore, Mullins's extensive notes on the March 29 meeting only state that she told Horst that Openshaw had told her to say that she had quit and had offered her four weeks' pay while her allegations were investigated.[12] Her notes do not reflect that she told Horst that Openshaw had terminated her on March 26, nor do they reflect that she made a grievance request. Finally, Mullins's telephone records and notes show that between March 30 and April 30 she never called the Union Hall or attempted to contact Horst either by phone or in person in regard to this matter.

[Mr. Kohlman]: ... You didn't tell him that you had been fired on the 27th or the 28th, either, correct?

[Mullins]: Correct. (Pl.'s Dep. Vol. I at 27.)

7. In this regard, Mullins testified as follows:

[Mr. Kohlman]: And there was a specific discussion with you in that meeting [on May 14] when you told Mr. Freund [Union counsel] that you found out for the first time that you no longer had employment with Cherry Hill on May 1, 2001, correct?

[Mullins]: Yes.

[Mr. Kohlman]: That is the first time in the entire world that any person or piece of paper ever indicated or stated to you that you no longer had employment with Cherry Hill; is that right?

[Mullins]: Yes. (Pl.'s Dep. Vol. I at 31–32.)

8. Mullins's testimony in this respect was as follows: "And I went through it and I explained the whole thing to [Horst] of how Mr. Openshaw had let me know that I no longer had a job." (Pl.'s Dep. Vol. II at 13.)

9. In her post-discovery affidavit, Mullins states, in pertinent part, as follows: "I clearly related to Mr. Horst that Mr. Openshaw had made it clear to me that I was no longer employed by Cherry Hill." (Pl.'s Affidavit ¶ 6.)

10. Horst states in his post-discovery declaration, "At no time during our meeting on March 29, 2001, did Ms. Mullins request that the Union file a grievance on her behalf." (Horst Dec. ¶ 4.)

11. Horst further states in his post-discovery declaration,

"I next spoke with Ms. Mullins on May 10 or May 11. During the course of that conversation, Ms. Mullins told me that she had contacted Cherry Hill on May 1 after receiving her last check, and that Cherry Hill had refused to permit her to return to work." (Horst Dec. ¶ 6.)

12. In this respect, Mullins's notes state,

"Arrived [at Union Hall] at approximately 4:50 p.m. paid my union dues and talked with Robert Horst told him the happenings ... [at Cherry Hill] and told him of the meeting with [Openshaw's secretary] and Mr. [Openshaw], how he made me tell that I quit and promised me four weeks [sic] pay until we come to further conclusions." (Pl.'s Dep. Exh. B–3, M–106.)

Following the March 29 meeting, Horst, acting at Mullins's request, spoke with Openshaw, who confirmed that Cherry Hill would retain Mullins on the payroll.[13] Openshaw also told Horst that he was investigating Mullins's allegations regarding drug use at Cherry Hill. The undisputed record reflects that never during this conversation did Openshaw tell Horst that Mullins had been fired, that she had quit, or that her employment with Cherry Hill had ended.

From March 26 through April 30, Cherry Hill paid Mullins her regular weekly wages. On May 1, when Mullins telephoned Cherry Hill to see if she had a job assignment, Openshaw's secretary told her that she had been informed that Mullins had quit. The next day, Mullins reported herself as out-of-work to a Union representative and he marked her work card accordingly and placed it in the out-of-work file. Mullins went to the Union Hall on May 7 to update her work card so that it properly reflected the equipment she was qualified to operate. Two days later she was offered a job through the Union, which she declined.

On either Thursday, May 10, or Friday, May 11, Mullins spoke with Horst and, for the first time, informed Horst that she had been terminated by Cherry Hill on May 1. Horst then confirmed with Openshaw that following completion of its investigation, Cherry Hill had terminated Mullins on May 1. Horst then requested that Cherry Hill provide a written explanation of Mullins's termination to the Union. Thereafter, Horst promptly arranged a meeting with the Union's attorney, Jeffrey Freund ("Freund"), to assess Mullins's situation.

The following Monday, May 14, Mullins, Freund, and Horst met for approximately an hour. During this meeting, Freund interviewed Mullins to ascertain the facts pertaining to her termination. In this interview, Mullins never told Freund either that she had been fired before May 1 or that she had asked the Union to file a grievance for her before May 10 or 11.[14]

That same day, May 14, the Union received a letter via facsimile from Openshaw on behalf of Cherry Hill. This letter was Cherry Hill's response to Horst's request for a written explanation of the reasons for Mullins's termination. Attached to the letter were the statements of two Cherry Hill employees, defendants Schmelzle and Mathis, describing certain experiences with Mullins. Schmelzle's letter recounted an incident in which she had reprimanded Mullins for showing a male co-worker photographs of herself in lingerie and making him uncomfortable. Mathis's letter described other incidents in

13. Horst further avers in his post-discovery declaration as follows:

"[Ms. Mullins] told me that she had met with James Openshaw, the President of Cherry Hill, and that he had promised to pay her for a period of time during which she would not have to report to work. She asked me to contact the Company and ensure that she would receive her pay. I agreed to do so." (Horst Dec. ¶ 3.)

Horst further avers:

"On either March 29 or March 30, I spoke with James Openshaw regarding Ms. Mullins. Mr. Openshaw confirmed that Cherry Hill would pay Ms. Mullins, and told me

that he was investigating Ms. Mullins's allegations." (Horst Dec. ¶ 5.)

14. Horst states in his declaration,

"During the course of that meeting, Mr. Freund told Ms. Mullins and me that the contract required that a grievance be filed within seven days of the event that was being grieved, or it was considered waived. He went through the dates with Ms. Mullins and counted the days from the date that she first learned she had been terminated, which she told him was May 1, and the day that she had contacted the Union about a grievance, which was May 10 or May 11." (Horst Dec. ¶ 8.)

which Mullins had made sexually suggestive remarks to her male co-workers.

After reviewing the facts, Freund explained to Mullins and Horst that a grievance was very unlikely to succeed. Specifically, Freund pointed out that any grievance filed would be untimely, given that the seven day period for filing grievances specified in the Agreement had expired well before Mullins informed the Union of her desire to challenge her termination. And, Freund noted, based on prior dealings with Cherry Hill, there was little or no likelihood that Cherry Hill would waive this time limit. Accordingly, Freund concluded the grievance was not likely to prevail at arbitration. Nonetheless, Freund told Mullins and Horst that he would contact Cherry Hill's attorney and attempt to persuade the company to reinstate Mullins.

Freund failed in his effort to urge Cherry Hill to rehire Mullins. Freund then wrote Horst a letter recounting his conversation with Cherry Hill's attorney and restating his view that a grievance would be unlikely to succeed in arbitration. Ultimately, the Union decided not to pursue Mullins's formal grievance. Thereafter, on July 3, Mullins was offered employment as an operating engineer through the Union. She accepted that job, but then left after a month and filed this suit.

Plaintiff's complaint asserts the following claims:

Count (I), breach of the duty of fair representation against the Union;

Count (II), intentional infliction of emotional distress against the Union;

Count (III), wrongful discharge undertaken in violation of public policy against Cherry Hill;

Count (IV), violation of labor agreement against Cherry Hill;

Count (V), libel, slander, and defamation against Cherry Hill, Openshaw, Schmelzle, and Mathis; and

Count (VI), intentional infliction of emotional distress against Cherry Hill and Openshaw.

Plaintiff's claims in Counts (II) and (VI) for intentional infliction of emotional distress have been voluntarily withdrawn. *See Mullins v. International Union of Operating Engineers Local No. 77 AFL—CIO of Washington D.C.,* —— F.Supp.2d ——, Civil No. 01–1465–A (E.D.Va. Aug. 8, 2002) (Order). Only the claims in Counts (I), (III), (IV), and (V) remain. Defendants have filed motions for summary judgment on each of these four remaining claims. As these motions have been fully briefed and argued, they are now ripe for disposition.

## II.

The Union seeks summary judgment[15] on Mullins's claim that it breached its duty of fair representation to her when it failed

---

**15.** The principles governing summary judgment are well-established and are the lens through which the record must be viewed. In essence, summary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Put differently, the movant is entitled to judgment as a matter of law where, "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). Importantly, inferences drawn from the facts must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet it is also true that the non-moving party, "may not rest upon mere allegations or denials ... but must set forth specific facts showing that there is a genuine issue [of material fact]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

to pursue a grievance on her behalf concerning her termination.

■ The statutory duty of fair representation obligates a union "to serve the interests of all [union] members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *see Humphrey v. Moore*, 375 U.S. 335, 343, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). But significantly, judicial review of a union's performance of its responsibilities is "highly deferential." *Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). Specifically, a union's actions are deemed "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. 1127 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). It follows from this that a union is granted considerable discretion in the handling and settling of grievances. *Vaca*, 386 U.S. at 192, 87 S.Ct. 903; *see Griffin v. International Union*, 469 F.2d 181, 183 (4th Cir.1972); *Smith v. Local 7898, United Steelworkers of America*, 834 F.2d 93, 96 (4th Cir.1987). Thus, a union is allowed to "screen grievances and press only those that it concludes will justify the expense and time

involved in terms of benefitting the membership at large." *Griffin*, 469 F.2d at 183 (citing *Encina v. Tony Lama Boot Co.*, 448 F.2d 1264 (5th Cir.1971)); *see Thompson v. Aluminum Company of America*, 276 F.3d 651, 657–58 (4th Cir.2002) (holding that union has discretion not to file a grievance that it believes has no chance of success due to mootness). And, a union's refusal to process a member's grievance on the reasonable belief that such grievance is unwarranted does not breach the duty of fair representation. *See Vaca*, 386 U.S. at 194, 87 S.Ct. 903; *see also Amburgey v. Consolidated Coal Co.*, 923 F.2d 27, 29 (4th Cir.1991); *Hypes v. Cyprus Kanawha Corp.*, 40 F.3d 1244, 1994 WL 660695, *3 (4th Cir. Nov.23 1994) (unpublished disposition).

■ Importantly, it is clear that before an employee can claim a breach of the duty of fair representation based on the failure to institute a grievance, she must show that she affirmatively requested in some reasonable fashion that the union pursue a grievance on her behalf.[16] This is so because "if a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him." *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1178 (7th Cir.1987).[17] Further, where there has been no request for the initiation of a grievance in any reasonable form, a union should not be left in the position of having

---

**16.** *See Wright v. Safeway, Inc.*, 804 F.Supp. 752, 756 (D.Md.1992) (holding that employee did not invoke grievance procedure where he never mentioned the word "grievance" to the Union and where he never asked the union to take any action on his behalf); *Perry v. Midstates Independent Union*, 20 Fed.Appx. 527, 530–31 (7th Cir.2001) (affirming that employee's request to his union representative for "help" with respect to his termination "was not specific enough to trigger the union's duty to file a grievance.").

**17.** *See Murman v. Renold Power Transmission Corp.*, 632 F.Supp. 853, 854 (M.D.Pa.1985) (holding that where an employee has never requested the union to file a grievance, the employee "can hardly argue a breach of the duty of fair representation on the union's part."); *Flanigan v. Local 671, Intern. Brotherhood of Teamsters*, 942 F.2d 824, 829 (2d Cir.1991) (stating, "[b]ecause appellants did not ask the Union to process a grievance on this issue, they can not complain that the Union failed to represent them properly.").

to speculate on whether the employee wishes a grievance to be filed. *See Flanigan v. Local 671, Intern. Brotherhood of Teamsters,* 942 F.2d 824, 829 (2d Cir.1991). While there is no talismanic formula of words or actions required for such a request, it is clear that the employee must take some steps that reasonably convey to the union that she wishes a grievance to be filed. *See Mechmet,* 825 F.2d at 1178 (7th Cir.1987).

■ These principles, applied here, make clear that Mullins's duty of fair representation claim must fail unless she can establish that she conveyed to the Union in some reasonable manner a timely request that the Union initiate a grievance. Carefully parsed, the current record discloses no triable issue of fact with respect to whether Mullins made such a request. Instead, the uncontradicted record reflects that Mullins (1) made no request to initiate grievance procedures in her March 29 meeting with Horst,[18] (2) did not speak with Horst between March 30 and May 10 or 11, and (3) made no request to file a grievance until May 10 or 11 despite being informed of her termination on May 1. Thus, Mullins "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Nor is this result changed because there are arguable record disputes as to (1) whether Openshaw told Mullins on March 26 that she was terminated or would be terminated and (2) whether Mullins told Horst on March 29 that she had been terminated on March 26. In the first place, both disputes rest on Mullins's inconsistent testimony and it is well-settled that a genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.[19] More importantly, neither dispute is material to the resolution of Mullins's fair representation claim. Even assuming Mullins was terminated on March 26 and told Horst of this on March 29, the record remains undisputed that she did not request that the Union file a grievance until

---

18. *See* n. 11, *supra.* The fact that Mullins remembers Horst using the word "arbitration" in the course of their March 29 meeting is not sufficient to create a triable issue of fact on whether Mullins requested the filing of a grievance. Significantly, Mullins's recollection is that Horst used the word, not that she did. Also significant is that Mullins does not place Horst's putative use of the term in any context; she merely recalls he used the word. Simply put, the mere fact that Horst may have used a particular word during their conversation *does not* address, let alone satisfy, the requirement that Mullins make a request of the Union for the filing of a grievance.

19. *See Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984); *see also S.P. v. Takoma Park,* 134 F.3d 260, 273, n. 12 (4th Cir.1998). Nor is this rule singular to the Fourth Circuit; virtually all circuits subscribe to this principle. *See Perma Research & Development Co. v. Singer,* 410 F.2d 572, 578 (2d Cir.1969); *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 705–06 (3d Cir.1988); *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996); *Farrell v. Automobile Club of Michigan,* 870 F.2d 1129, 1131–32 (6th Cir. 1989); *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104 (7th Cir.1985); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365–66 (8th Cir.1983); *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir.1975); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986); *Van T. Junkins and Associates v. United States Industries,* 736 F.2d 656, 657 (11th Cir.1984); *Pyramid Securities Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C.Cir.1991). It may be argued that this principle does not apply where a non-moving party's testimony changes over a very brief period of time. Here, Mullins's testimony changed overnight. In any event, the disputes in the record are not material and this is dispositive.

May 10 or 11. In sum, even when the disputed facts are resolved in Mullins's favor, there is no triable issue of fact supporting her claim that she reasonably and timely notified the Union that she wished to initiate a grievance procedure. Rather, the record, fairly read, establishes that Mullins first requested the filing of a grievance well after the seven day period allowed by the Agreement. Accordingly, the Union is entitled to summary judgment on Mullins's fair representation claim.

## III.

Although Mullins concedes that she was an at-will employee, she claims she was wrongfully terminated in violation of Virginia public policy. More specifically, Mullins contends that because Virginia public policy requires employers to provide safe, drug-free workplaces and prevents discharge for the reporting of dangerous conditions, she has a viable claim against Cherry Hill for wrongful discharge. *See* Va.Code §§ 40.1–51.2, 40.1–51.2:1, 2.2–4312, 11–51.1; *see also Bowman v. State Bank of Keysville*, 229 Va. 534, 539–40, 331 S.E.2d 797 (1985); *Weinberger v. MCI Telecommunications Corp.*, 16 F.3d 414, 1994 WL 18081, *3 (4th Cir. Jan.25, 1994) (unpublished disposition). Cherry Hill argues in response that Maryland law is applicable and that under Maryland law Mullins's claim must fail because Maryland law recognizes a tort action for wrongful discharge on public policy grounds only in more limited circumstances not present here. *See Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981).

■ The threshold issue in the analysis of this claim is the proper choice of governing state law. Nor is this an inconse-quential matter, as the differences between Virginia and Maryland law are likely outcome determinative. A federal court in a diversity case must apply the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir.1999); *Milton v. I.I.T. Research Institute*, 138 F.3d 519, 521 (4th Cir.1998). Accordingly, Virginia choice of law rules apply in this case. In tort actions, Virginia applies the doctrine of *lex loci delecti*, which holds that the law of the place where the alleged injury occurred governs. *See McMillan v. McMillan*, 219 Va. 1127, 1128, 253 S.E.2d 662 (1979); *Jones v. R.S. Jones & Assocs., Inc.*, 246 Va. 3, 5, 431 S.E.2d 33 (1993); *see also Milton*, 138 F.3d at 521; *Lapkoff v. Wilks*, 969 F.2d 78, 81 (4th Cir.1992).

■ Whether Mullins was terminated on March 26 or May 1 makes no difference to the choice of law analysis because it is clear that, in either instance, the termination was effected in Maryland and therefore Maryland law applies. The March 26 meeting in which Mullins alleges that Openshaw told her she was terminated occurred in Jessup, Maryland. Hence, in this event, the termination is clearly controlled by Maryland law. Even if it is assumed that Mullins was told of her termination in the May 1 telephone call she made to the Cherry Hill office in Maryland,[20] her termination nonetheless occurred in Maryland. The fortuitous circumstance that Mullins was in Virginia when she placed the telephone call is insufficient to establish the application of Virginia law. The termination was effected by

---

**20.** It is worth noting that in adopting this position to avoid the consequences of Maryland law, Mullins is taking a position incon-sistent with her original contention that she was terminated in Maryland on March 26.

Cherry Hill in Maryland and it is immaterial that Mullins happened to be in Virginia when she called Cherry Hill to receive notice of termination. Surely if Mullins had initiated the telephone call from the District of Columbia or even Cancun, Mexico, she could not plausibly assert that District of Columbia or Mexican law controls.

▮▮▮ Under Maryland law, Mullins has no legally cognizable claim for wrongful discharge. Maryland permits a claim for wrongful discharge only where the discharge contravenes "a clear mandate of public policy." *Adler*, 291 Md. at 47, 432 A.2d 464; *see also Molesworth v. Brandon*, 341 Md. 621, 630, 672 A.2d 608 (1996); *Milton*, 138 F.3d at 522. Maryland courts have recognized such a mandate only in two limited circumstances, namely (1) where an employee has been fired for refusing to violate the law or the legal rights of a third party,[21] and (2) where an employee has been terminated for exercising a specific legal right or duty.

The instant facts fit neither of these circumstances. Mullins does not allege that Cherry Hill requested that she violate the law or the rights of a third party, nor was Mullins under any mandatory legal duty to report drug use and safety violations on the job.[22] Only if Maryland law compelled Mullins to report drug use would she have a legally cognizable claim under Maryland law for wrongful discharge. Because Mullins's termination does not contravene "a clear mandate of public policy," [23] summary judgment is appropriate on her claim against Cherry Hill for wrongful termination in violation of Maryland public policy.

## IV.

Next, Cherry Hill seeks summary judgment on Mullins's claim that her termination violated the Agreement.

▮▮▮ It is well-established that an individual employee may bring suit against her employer for breach of a collective bargaining agreement under the Labor Management Relations Act (L.M.R.A.) § 301, 29 U.S.C. § 185. *See DelCostello v. Intern. Broth. of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (citing *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962)); *see also Thomas v. Consolidation Coal Co.*, 380 F.2d 69, 76 (4th Cir.1967). Importantly, however, prior to doing so, the employee must demonstrate that she attempted "to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." *DelCostello*, 462 U.S. at 163, 103 S.Ct. 2281. *See* 29 U.S.C. § 185; *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *see also Thompson v. Aluminum Co. of America*, 276 F.3d 651, 656 (4th Cir.2002). For this reason, "[a] cause of action will only lie against an employer if the union has breached its duty of fair representation of

---

**21.** *See Kessler v. Equity Management, Inc.*, 82 Md.App. 577, 585, 572 A.2d 1144 (1990).

**22.** *See Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 478, 588 A.2d 760 (1991) (holding no legally cognizable claim for wrongful discharge where employee was terminated after seeking legal redress against a co-worker for assault and battery); *Ewing v. Koppers Co.*, 312 Md. 45, 49, 537 A.2d 1173 (1988) (holding that because Maryland law expressly creates right to file workers' compensation claim, action exists for wrongful discharge for termination based solely on the filing of a workers' compensation claim); *see also Milton*, 138 F.3d at 522 (holding that cause of action for wrongful discharge not available where plaintiff alleges she was terminated for reporting a crime).

**23.** *See Adler*, 291 Md. at 47, 432 A.2d 464.

the employee." *Amburgey v. Consolidated Coal Co.,* 923 F.2d 27, 29 (4th Cir.1991) (citing *Vaca,* 386 U.S. at 184–86, 87 S.Ct. 903).

As already noted, Mullins did not exhaust the grievance procedure because she failed to make a timely request that the Union file a grievance with Cherry Hill. Nor did the Union breach its duty of fair representation by not filing a grievance that it believed would not succeed at arbitration. *See* Part II, *supra.* Consequently, no basis exists for Mullins's claim that Cherry Hill breached the Agreement by terminating her and Cherry Hill is thus entitled to judgment as a matter of law on this count.

## V.

Finally, Mullins claims that Cherry Hill, Openshaw, Schmelzle, and Mathis defamed her in their letters to the Union. Cherry Hill and the individual defendants respond that summary judgment is required because Mullins's claim of defamation is preempted by Section 301 of the L.M.R.A., 29 U.S.C. § 185.

Preemption occurs only when resolution of a state law claim depends upon the meaning of the collective bargaining agreement,[24] or when resolution of the state law claim is "inextricably intertwined with consideration of the terms of the labor contract."[25] *Allis–Chalmers,* 471 U.S. at 213, 105 S.Ct. 1904; *see also McCormick,* 934 F.2d 531, 534 (4th Cir.1991); *Owen v. Carpenters' District Council,* 161 F.3d 767, 772 (4th Cir.1998). In particular, where an investigation is undertaken pursuant to a collective bargaining agreement, preemption under Section 301 of the L.M.R.A. is required. *Barbe v. Great Atlantic and Pacific Tea Co.,* 722 F.Supp. 1257, 1260 (D.Md.1989), *affirmed* 940 F.2d 651 (4th Cir.1991) (unpublished opinion), *cert. denied* 502 U.S. 1059, 112 S.Ct. 939, 117 L.Ed.2d 109 (1992); *see also Stallard v. B–Line Systems,* 799 F.Supp. 924, 926 (S.D.Ill.1992). Furthermore, Section 301 not only preempts state law claims against parties to a collective bargaining agreement, but also preempts state law claims against non-signatories where interpretation of the agreement is required for resolution. *See Foy v. Giant Food, Inc.,* 298 F.3d 284, 290 n. 4 (4th Cir.2002).[26]

Given these settled principles, it follows that Mullins's defamation claim is preempted because it is clear that such a claim is "inextricably intertwined with consideration of the terms of the labor contract." *See Allis–Chalmers,* 471 U.S. at 213, 105 S.Ct. 1904. Mullins contends that preemption is not required here because the Agreement does not explicitly enumerate the investigatory procedures that may be used in a decision to terminate an em-

---

**24.** *See Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

**25.** Section 301 of the L.M.R.A. provides exclusive federal jurisdiction over "suits for violation of contracts between an employer and a labor organization representing employees." 29 U.S.C. § 185; *see Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Section 301 also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective-bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements." *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451 (1975).

**26.** *See also Baker v. Farmers' Electronic Coop. Inc.,* 34 F.3d 274, 284–85 (5th Cir.1994) (holding that "[in] cases involving claims against fellow employees where the question of section 301 preemption has arisen, courts have governed their determinations on the preemption by the necessity of referring to a [collective bargaining agreement] for resolution of the claim rather than by the individual status of the defendant.").

ployee. While it is true that the Agreement does not establish a specific protocol for investigation of employees, the express provisions of the Agreement clearly require Cherry Hill to provide the Union with written reasons for the termination of employees.[27] The Agreement also grants Cherry Hill the right to respond to grievances filed by the Union.[28] As a result, Section 301 of the L.M.R.A. preempts state law and summary judgment is appropriate on Mullins's claim of defamation against Cherry Hill and the individual defendants.

## VI.

For all of the reasons stated herein, defendants' motions for summary judgment must be granted. An appropriate order will issue.

---

**27.** Article V of the Agreement, in pertinent part, states,

"When an Employer discharges an engineer for cause (such as but not limited to: illegal drugs, drunkenness, insubordination, dishonesty, inability to operate equipment, unsafe and dangerous conduct), the Employer shall within a seven (7) day period provide the Union with the appropriate termination slip which is normally provided the employee and the unemployment office."

**28.** Article XVI of the Agreement, in pertinent part, states, "The Company shall respond to the grievance within seven (7) days of receipt."